Gretchen M. Nelson (State Bar No. 112566)
Carlos F. Llinás Negret (State Bar No. 284746)
**NELSON & FRAENKEL LLP**
601 South Figueroa St., Suite 2050
Los Angeles, CA 90017
Tel.: 213-622-6469
Fax: 213-622-6019
Email: cllinas@nflawfirm.com
Email: gnelson@nflawfirm.com

*Attorneys for Matthew Russo*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW RUSSO,<br><br>Plaintiffs,<br><br>vs.<br><br>APL MARITIME LTD, APL MARINE SERVICES, LTD, AMERICAN PRESIDENT LINES, LLC, CMA CGM (AMERICA) LLC, CMA-CGM S.A., JOHN FREDERICK DAYLOR<br><br>Defendants. | CASE NO.:<br><br>**COMPLAINT FOR DAMAGES**<br><br>**JURY TRIAL DEMANDED** |

## **COMPLAINT**

MATTHEW RUSSO, individually, ("Plaintiff"), by and through his undersigned attorneys, files his Complaint against APL MARITIME LTD, APL MARINE SERVICES, LTD, AMERICAN PRESIDENT LINES, LLC, CMA CGM (AMERICA) LLC, CMA-CGM S.A. and JOHN FREDERICK DAYLOR (collectively "Defendants"), and alleges as follows:

# JURISDICTION

1.     This Court has subject matter jurisdiction over the Plaintiff's claims against Defendants pursuant to 28 U.S.C. §1331. This is a seaman's personal injury action arising under 46 U.S.C. §30104 et seq. (commonly known as the "Jones Act"), providing that a "seaman injured in the course of employment or, if the seaman dies from the injury, the personal representative of the seaman may bring a civil action at law, with the right of trial by jury against the employer." The claims against Defendants also arise under the General Maritime Law of the United States.

2.     This Court has personal jurisdiction over Defendant APL MARITIME, LTD., as this business entity has engaged in systematic and continuous activities within the State of California. Namely, APL MARITIME, LTD. has systematically and continuously maintained, operated, and managed a fleet of vessels in the ports of California.

3.     This Court has personal jurisdiction over Defendant APL MARINE SERVICES LTD., as this business entity has engaged in systematic and continuous activities within the State of California. Namely, APL MARINE SERVICES LTD. has systematically and continuously maintained, operated, and managed a fleet of vessels in the ports of California.

4.     This Court has personal jurisdiction over Defendant AMERICAN PRESIDENT LINES, LLC., as the business entity has engaged in systematic and continuous activities within the State of California. Namely, Defendant AMERICAN PRESIDENT LINES, LLC. has systematically and continuously maintained, operated, and managed a fleet of vessels in the ports of California.

5.     This Court has personal jurisdiction over Defendant CMA CGM (AMERICA) LLC, as the business entity has engaged in systematic and continuous activities within the State of California. Namely, CMA CGM (AMERICA) LLC has systematically and continuously maintained, operated, and managed a fleet of vessels in the ports of California.

6.     This Court has personal jurisdiction over Defendant CMA-CGM S.A, as the business entity has engaged in systematic and continuous activities within the State of California. Namely, CMA-CGM S.A has systematically and continuously maintained, operated, and managed a fleet of vessels in the ports of California.

Complaint
Jury Trial Demand

7.      This Court has personal jurisdiction over Defendant JOHN FREDERICK DAYLOR, Namely,  JOHN FREDERICK DAYLOR has systematically and continuously maintained contacts in California, and vessels in the ports of California.

8.      Venue is appropriate in this district pursuant to 28 U.S.C. § 1391 (a)(1).

**PARTIES**

9.      At all relevant times, Plaintiff MATTHEW RUSSO was employed as a seaman aboard the U.S. flag commercial container vessel M/V APL GULF EXPRESS.

10.     Defendant APL MARITIME, LTD is, and at all relevant times was, a business entity formed in Delaware, engaged in systematic and continuous activities with the State of California. At all times material, Defendant APL MARITIME, LTD personally or through an agent a) operated, conducted, engaged in and/or carried on a business venture in the State of California, and b) engaged in substantial business activity in the State of California.

11.     At all times material, Defendant APL MARITIME, LTD, owned, operated, managed, maintained and/or controlled the vessel M/V APL GULF EXPRESS.

12.     At all times relevant and material, Plaintiff MATTHEW RUSSO was an employee of Defendant APL MARITIME, LTD aboard the vessel M/V APL GULF EXPRESS.

13.     In the alternative, at all times relevant and material, Plaintiff MATTHEW RUSSO was a borrowed servant of Defendant APL MARITIME, LTD pursuant to *Standard Oil v. Anderson*, 212 U.S. 215 (1909) and its progeny. At all times material, a) Plaintiff MATTHEW RUSSO was performing work for Defendant APL MARITIME, LTD aboard the vessel M/V APL GULF EXPRESS, b) Defendant APL MARITIME, LTD had control over the work Plaintiff MATTHEW RUSSO was performing aboard the vessel M/V APL GULF EXPRESS, c) Plaintiff MATTHEW RUSSO agreed to work for Defendant APL MARITIME, LTD aboard the vessel M/V APL GULF EXPRESS, d) Defendant APL MARITIME, LTD furnished the work tools of Plaintiff MATTHEW RUSSO, including the vessel M/V APL GULF EXPRESS, e) Plaintiff MATTHEW RUSSO was subject to the commands and control of Defendant APL MARITIME, LTD via its employees, agents and servants, including Chief Engineer and Defendant JOHN FREDERICK DAYLOR.

14.     Defendant APL MARINE SERVICES, LTD is, and at all relevant times was, a business entity registered in Delaware, engaged in systematic and continuous activities with the State of California. At all times material, Defendant APL MARINE SERVICES, LTD personally or through an agent a) operated, conducted, engaged in and/or carrier on a business venture in the State of California, and b) engaged in substantial business activity in the State of California.

15.     At all times material, Defendant APL MARINE SERVICES, LTD, owned, operated, managed, maintained and/or controlled the vessel M/V APL GULF EXPRESS.

16.     At all times relevant and material, Plaintiff MATTHEW RUSSO was an employee of Defendant APL MARINE SERVICES, LTD aboard the vessel M/V APL GULF EXPRESS.

17.     In the alternative, at all times relevant and material, Plaintiff MATTHEW RUSSO was a borrowed servant of Defendant APL MARINE SERVICES, LTD pursuant to *Standard Oil v. Anderson*, 212 U.S. 215 (1909) and its progeny. At all times material, a) Plaintiff MATTHEW RUSSO was performing work for Defendant APL MARINE SERVICES, LTD aboard the vessel M/V APL GULF EXPRESS, b) Defendant APL MARINE SERVICES, LTD had control over the work Plaintiff MATTHEW RUSSO was performing aboard the vessel M/V APL GULF EXPRESS, c) Plaintiff MATTHEW RUSSO agreed to work for Defendant APL MARINE SERVICES, LTD aboard the vessel M/V APL GULF EXPRESS, d) Defendant APL MARINE SERVICES, LTD furnished the work tools of Plaintiff MATTHEW RUSSO, including the vessel M/V APL GULF EXPRESS, e) Plaintiff MATTHEW RUSSO was subject to the commands and control of Defendant APL MARINE SERVICES, LTD via its employees, agents and servants, including Chief Engineer and Defendant JOHN FREDERICK DAYLOR.

18.     Defendant AMERICAN PRESIDENT LINES, LLC is, and at all relevant times was, a business entity formed in Maryland, engaged in systematic and continuous activities with the State of California. At all times material, Defendant AMERICAN PRESIDENT LINES, LLC personally or through an agent a) operated, conducted, engaged in and/or carrier on a business venture in the State of California, and b) engaged in substantial business activity in the State of California.

19.     At all times material, Defendant AMERICAN PRESIDENT LINES, LLC, owned, operated, managed, maintained and/or controlled the vessel M/V APL GULF EXPRESS.

20.     At all times relevant and material, Plaintiff MATTHEW RUSSO was an employee of Defendant AMERICAN PRESIDENT LINES, LLC aboard the vessel M/V APL GULF EXPRESS.

21.     In the alternative, at all times relevant and material, Plaintiff MATTHEW RUSSO was a borrowed servant of Defendant AMERICAN PRESIDENT LINES, LLC pursuant to *Standard Oil v. Anderson*, 212 U.S. 215 (1909) and its progeny. At all times material, a) Plaintiff MATTHEW RUSSO was performing work for Defendant AMERICAN PRESIDENT LINES, LLC aboard the vessel M/V APL GULF EXPRESS, b) Defendant AMERICAN PRESIDENT LINES, LLC had control over the work Plaintiff MATTHEW RUSSO was performing aboard the vessel M/V APL GULF EXPRESS, c) Plaintiff MATTHEW RUSSO agreed to work for Defendant AMERICAN PRESIDENT LINES, LLC aboard the vessel M/V APL GULF EXPRESS, d) Defendant AMERICAN PRESIDENT LINES, LLC furnished the work tools of Plaintiff MATTHEW RUSSO, including the vessel M/V APL GULF EXPRESS, e) Plaintiff MATTHEW RUSSO was subject to the commands and control of Defendant AMERICAN PRESIDENT LINES, LLC via its employees, agents and servants, including Chief Engineer and Defendant JOHN FREDERICK DAYLOR.

22.     Defendant CMA CGM (AMERICA) LLC is, and at all relevant times was, a business entity formed in Maryland, engaged in systematic and continuous activities with the State of California. At all times material, Defendant CMA CGM (AMERICA) LLC personally or through an agent a) operated, conducted, engaged in and/or carrier on a business venture in the State of California, and b) engaged in substantial business activity in the State of California.

23.     At all times material, Defendant CMA CGM (AMERICA) LLC, owned, operated, managed, maintained and/or controlled the vessel M/V APL GULF EXPRESS.

24.     At all times relevant and material, Plaintiff MATTHEW RUSSO was an employee of Defendant CMA CGM (AMERICA) LLC aboard the vessel M/V APL GULF EXPRESS.

25.     In the alternative, at all times relevant and material, Plaintiff MATTHEW RUSSO was a borrowed servant of Defendant CMA CGM (AMERICA) LLC pursuant to *Standard Oil v. Anderson*, 212 U.S. 215 (1909) and its progeny. At all times material, a) Plaintiff MATTHEW RUSSO was performing work for Defendant CMA CGM (AMERICA) LLC aboard the M/V APL

GULF EXPRESS, b) Defendant CMA CGM (AMERICA) LLC had control over the work Plaintiff MATTHEW RUSSO was performing aboard the vessel M/V APL GULF EXPRESS, c) Plaintiff MATTHEW RUSSO agreed to work for Defendant CMA CGM (AMERICA) LLC aboard the vessel M/V APL GULF EXPRESS, d) Defendant CMA CGM (AMERICA) LLC furnished the work tools of  Plaintiff MATTHEW RUSSO, including the vessel M/V APL GULF EXPRESS, e) Plaintiff MATTHEW RUSSO was subject to the commands and control of Defendant CMA CGM (AMERICA) LLC via its employees, agents and servants, including Chief Engineer and Defendant JOHN FREDERICK DAYLOR.

26.     Defendant CMA-CGM S.A. is, and at all relevant times was, a foreign business entity, engaged in systematic and continuous activities with the State of California. At all times material, Defendant CMA-CGM S.A. personally or through an agent a) operated, conducted, engaged in and/or carrier on a business venture in the State of California, and b) engaged in substantial business activity in the State of California.

27.     At all times material, Defendant CMA-CGM S.A., owned, operated, managed, maintained and/or controlled the vessel M/V APL GULF EXPRESS.

28.     At all times relevant and material, Plaintiff MATTHEW RUSSO was an employee of Defendant CMA CGM S.A. aboard the U.S. flag container vessel M/V APL GULF EXPRESS.

29.     In the alternative, at all times relevant and material, Plaintiff MATTHEW RUSSO was a borrowed servant of Defendant CMA CGM S.A. pursuant to *Standard Oil v. Anderson*, 212 U.S. 215 (1909) and its progeny. At all times material, a) Plaintiff MATTHEW RUSSO was performing work for Defendant CMA CGM S.A. aboard the vessel M/V APL GULF EXPRESS, b) Defendant CMA CGM S.A. had control over the work Plaintiff MATTHEW RUSSO was performing aboard the vessel M/V APL GULF EXPRESS, c) Plaintiff MATTHEW RUSSO agreed to work for Defendant CMA CGM S.A. aboard the vessel M/V APL GULF EXPRESS, d) Defendant CMA CGM S.A. furnished the work tools of Plaintiff MATTHEW RUSSO, including the vessel M/V APL GULF EXPRESS, e) Plaintiff MATTHEW RUSSO was subject to the commands and control of Defendant CMA CGM S.A. via its employees, agents and servants, including Chief Engineer and Defendant JOHN FREDERICK DAYLOR.

30.     Defendant JOHN FREDERICK DAYLOR, at all relevant and material times was employed as the Chief Engineer, employed as department head of Engine Department, and employed as a member of the crew aboard the vessel M/V APL GULF EXPRESS.

31.     At all relevant and material times, Defendant Chief Engineer JOHN FREDERICK DAYLOR was Plaintiff MATHEW RUSSO'S supervisor aboard the M/V APL GULF EXPRESS.

32.     Defendant Chief Engineer JOHN FREDERICK DAYLOR, at all relevant and material times was an agent, apparent agent, servant, borrowed servant and employee of the vessel M/V APL GULF EXPRESS.

33.     At all times relevant and material, during his interactions with Plaintiff MATTHEW RUSSO and the rest of the crew, Defendant Chief Engineer JOHN FREDERICK DAYLOR acted within the scope of his employment and agency relationship with the U.S. flag container vessel M/V APL GULF EXPRESS.

34.     Defendant Chief Engineer JOHN FREDERICK DAYLOR at all relevant and material times was an agent, apparent agent, servant, borrowed servant, and employee of Defendant APL MARITIME, LTD.

35.     At all times relevant and material, during his interactions with Plaintiff MATTHEW RUSSO and the rest of the crew, Defendant Chief Engineer JOHN FREDERICK DAYLOR acted within the scope of his employment and agency relationship with Defendant APL MARITIME, LTD.

36.     Defendant Chief Engineer JOHN FREDERICK DAYLOR at all relevant and material times was an agent, apparent agent, servant, borrowed servant, and employee of Defendant APL MARINE SERVICES, LTD.

37.     At all times relevant and material, during his interactions with Plaintiff MATTHEW RUSSO and the rest of the crew, Defendant Chief Engineer JOHN FREDERICK DAYLOR acted within the scope of his employment and agency relationship with Defendant APL MARINE SERVICES, LTD.

38.     Defendant Chief Engineer JOHN FREDERICK DAYLOR, at all relevant and material times was an agent, apparent agent, servant, borrowed servant, and employee of Defendant AMERICAN PRESIDENT LINES, LLC.

39.     At all times relevant and material, during his interactions with Plaintiff MATTHEW RUSSO and the rest of the crew, Defendant Chief Engineer JOHN FREDERICK DAYLOR acted within the scope of his employment and agency relationship with Defendant AMERICAN PRESIDENT LINES, LLC.

40.     Defendant Chief Engineer JOHN FREDERICK DAYLOR at all relevant and material times was an agent, apparent agent, servant, borrowed servant, and employee of Defendant CMA CGM (AMERICA) LLC.

41.     At all times relevant and material, during his interactions with Plaintiff MATTHEW RUSSO and the rest of the crew, Defendant Chief Engineer JOHN FREDERICK DAYLOR acted within the scope of his employment and agency relationship with Defendant CMA CGM (AMERICA) LLC.

42.     Defendant Chief Engineer JOHN FREDERICK DAYLOR at all relevant and material times was an agent, apparent agent, servant, borrowed servant, and employee of Defendant CMA CGM S.A.

43.     At all times relevant and material, during his interactions with Plaintiff MATTHEW RUSSO and the rest of the crew, Defendant Chief Engineer JOHN FREDERICK DAYLOR acted within the scope of his employment and agency relationship with Defendant CMA CGM S.A.

44.     Plaintiff is informed and believes and therefore alleges that, at all times relevant to this action, Defendants, and each of them, were the agents, apparent agents, servants, employees, assistants, and consultants of each of their co-Defendants, and were, as such, acting within the course of and scope of the authority of their agency and employment, and that each and every Defendant when acting as a principal, was negligent and careless in the selection and hiring of each and every co-Defendant as an agent, apparent agent, servant, employee, assistant and/or consultant.

## **GENERAL ALLEGATIONS**

### **M/V APL GULF EXPRESS Management Structure**

45.     The incident which gave rise to this lawsuit occurred aboard a U.S. flagged vessel while the Plaintiff was working as a seaman aboard the vessel M/V APL GULF EXPRESS.

46.     Plaintiff MATTHEW RUSSO began his employment aboard the vessel M/V APL GULF EXPRESS on or about October 29, 2022, in his capacity as a Third Assistant Engineer.

47.     At all times material, Plaintiff MATTHEW RUSSO was employed as a seaman in the service of M/V APL GULF EXPRESS.

48.     Plaintiff MATTHEW RUSSO has been a licensed Third Assistant Engineer since 2021, and was qualified in both training and experience, for the Third Assistant Engineer position, for which he was hired to work aboard the vessel M/V APL GULF EXPRESS.

49.     From October 29, 2022, through January 5, 2023, the Captain/Master on the vessel, M/V APL GULF EXPRESS, was one of Plaintiff MATTHEW RUSSO's supervisors. At all times material and relevant:

a.     The Captain/Master on the vessel M/V APL GULF EXPRESS had the power to promote, demote, and fire Plaintiff MATTHEW RUSSO, approve raises, and set Plaintiff MATTHEW RUSSO's schedule and hours.

b.     At all times material, the Captain/Master on the vessel M/V APL GULF EXPRESS, was an agent, apparent agent, servant and employee of the M/V APL GULF EXPRESS, and at all relevant times, including during his interactions with Plaintiff MATTHEW RUSSO and Defendant Chief Engineer JOHN FREDERICK DAYLOR, he acted within the scope of his agency and employment relationship with the M/V APL GULF EXPRESS.

c.     The Captain/Master on the vessel M/V APL GULF EXPRESS, was an agent, apparent agent, servant, borrowed servant, and employee of Defendant APL MARINE SERVICES, LTD, and during all of his interactions with Plaintiff MATTHEW RUSSO and Defendant Chief Engineer JOHN FREDERICK

DAYLOR, the Captain/Master acted within the scope of his employment and agency relationship with Defendant APL MARINE SERVICES, LTD;

d. The Captain/Master on the vessel M/V APL GULF EXPRESS, was an agent, apparent agent, servant, borrowed servant, and employee of Defendant APL MARITIME, LTD, and during all of his interactions with Plaintiff MATTHEW RUSSO and Defendant Chief Engineer JOHN FREDERICK DAYLOR, the Captain and Master acted within the scope of his employment and agency relationship with Defendant APL MARITIME, LTD;

e. The Captain/Master on the vessel M/V APL GULF EXPRESS, was an agent, apparent agent, servant, borrowed servant, and employee of Defendant AMERICAN PRESIDENT LINES, LLC., and during all of his interactions with Plaintiff MATTHEW RUSSO and Defendant Chief Engineer JOHN   FREDERICK DAYLOR, the Captain/Master acted within the scope of his employment and agency relationship with Defendant AMERICAN PRESIDENT LINES, LLC.;

f. The Captain/Master on the vessel M/V APL GULF EXPRESS, was an agent, apparent agent, servant, borrowed servant, and employee of Defendant CMA CGM (AMERICA) LLC., and during all of his interactions with Plaintiff MATTHEW RUSSO and Defendant Chief Engineer JOHN DAYLOR, the Captain/Master acted within the scope of his employment and agency relationship with Defendant CMA CGM (AMERICA) LLC.;

g. The Captain/Master on the vessel M/V APL GULF EXPRESS, was an agent, apparent agent, servant, borrowed servant, and employee of Defendant CMA CGM S.A., and during all of his interactions with Plaintiff MATTHEW RUSSO and Defendant Chief Engineer JOHN FREDERICK DAYLOR, the Captain/Master acted within the scope of his employment and agency relationship with Defendant CMA CGM S.A.

50. From October 29, 2022, through January 5, 2023, the Captain/Master on the vessel, M/V APL GULF EXPRESS, was a direct supervisor of Defendant Chief Engineer JOHN

1   FREDERICK DAYLOR.  At all times material and relevant, the Captain/Master on the vessel M/V

2   APL GULF EXPRESS had the power to promote, demote, and fire Defendant Chief Engineer JOHN

3   FREDERICK DAYLOR, approve raises, and set Defendant Chief Engineer JOHN FREDERICK

4   DAYLOR's schedule and hours.

5       51.     From October 29, 2022, through January 5, 2023, the Captain/Master on the vessel,

6   M/V APL GULF EXPRESS, was a supervisor of the vessel's Chief Mate, Second Mate, First

7   Assistant Engineer(s), Second Assistant Engineer(s), and Third Assistant Engineer(s). At all times

8   material and relevant, the Captain/Master on the vessel M/V APL GULF EXPRESS had the power

9   to promote, demote, and fire the vessel's Chief Mate, First Assistant Engineer(s), Second Assistant

10  Engineer(s), and Third Assistant Engineer(s). The Captain/Master on the vessel, M/V APL GULF

11  EXPRESS, had the power to approve raises and set these crewmembers' schedule and hours.

12      52.     From October 29, 2022, through January 5, 2023, Defendant JOHN FREDERICK

13  DAYLOR, Chief Engineer on the vessel M/V APL GULF EXPRESS, was the highest ranked

14  supervisor of the vessel's Engine Department. As a result, Defendant Chief Engineer JOHN

15  FREDERICK DAYLOR, was a supervisor of the vessel's First Assistant Engineer(s), Second

16  Assistant Engineer(s), and Third Assistant Engineer(s). At all times material and relevant, Defendant

17  Chief Engineer JOHN FREDERICK DAYLOR had the power to promote, demote, and fire these

18  crewmembers. Defendant Chief Engineer JOHN FREDERICK DAYLOR also had the power to

19  approve raises and set these crewmembers' schedule and hours.

20      53.     From October 29, 2022, through January 5, 2023, the First Assistant Engineer aboard

21  the M/V APL GULF EXPRESS, was one of Plaintiff MATTHEW RUSSO's supervisors.  At all

22  times material and relevant:

23      a.  The First Assistant Engineer on the vessel M/V APL GULF EXPRESS had the power to

24          promote, demote, and fire Plaintiff MATTHEW RUSSO, approve raises, and set

25          Plaintiff MATTHEW RUSSOS's schedule and hours.

26      b.  The First Assistant Engineer evaluated the work of Plaintiff MATTHEW RUSSO,

27          scoring Plaintiff's performance periodically, with the ability to affect future employment

28          aboard the M/V APL GULF EXPRESS and other APL vessels.

c. The First Assistant Engineer on the vessel M/V APL GULF EXPRESS, was an agent, apparent agent, servant and employee of the M/V APL GULF EXPRESS, and at all relevant times during his interactions with Plaintiff MATTHEW RUSSO, he acted within the scope of his agency and employment relationship with the M/V APL GULF EXPRESS.

d. The First Assistant Engineer on the vessel M/V APL GULF EXPRESS, was an agent, apparent agent, servant and employee of the Defendant APL MARINE SERVICES, LTD, and at all relevant times during his interactions with Plaintiff MATTHEW RUSSO, he acted within the scope of his agency and employment relationship with the Defendant APL MARINE SERVICES, LTD.

e. The First Assistant Engineer on the vessel M/V APL GULF EXPRESS, was an agent, apparent agent, servant and employee of the Defendant APL MARITIME, LTD, and at all relevant times during his interactions with Plaintiff MATTHEW RUSSO, he acted within the scope of his agency and employment relationship with the Defendant APL MARITIME, LTD.

f. The First Assistant Engineer on the vessel M/V APL GULF EXPRESS, was an agent, apparent agent, servant and employee of the of Defendant AMERICAN PRESIDENT LINES, LLC., and at all relevant times during his interactions with Plaintiff MATTHEW RUSSO, he acted within the scope of his agency and employment relationship with the of Defendant AMERICAN PRESIDENT LINES, LLC.

g. The First Assistant Engineer on the vessel M/V APL GULF EXPRESS, was an agent, apparent agent, servant and employee of the of Defendant CMA CGM (AMERICA) LLC, and at all relevant times during his interactions with Plaintiff MATTHEW RUSSO, he acted within the scope of his agency and employment relationship with Defendant CMA CGM (AMERICA) LLC.

h. The First Assistant Engineer on the vessel M/V APL GULF EXPRESS, was an agent, apparent agent, servant and employee of the of defendant CMA CGM S.A., and at all relevant times during his interactions with Plaintiff MATTHEW RUSSO, he acted

12

within the scope of his agency and employment relationship with Defendant CMA CGM S.A

54.     From October 29, 2022, through January 5, 2023, Defendant JOHN FREDERICK DAYLOR, Chief Engineer on the vessel M/V APL GULF EXPRESS, was one of Plaintiff MATTHEW RUSSO's supervisors.  At all times material and relevant:

    a.   Defendant JOHN FREDERICK DAYLOR, Chief Engineer on the vessel M/V APL GULF EXPRESS had the power to promote, demote, and fire Plaintiff MATTHEW RUSSO, approve raises, and set Plaintiff MATTHEW RUSSOS's schedule and hours.

    b.   Defendant Chief Engineer JOHN FREDERICK DAYLOR evaluated the work of Plaintiff MATTHEW RUSSO, scoring Plaintiff's performance periodically, with the ability to affect future employment aboard the M/V APL GULF EXPRESS and other APL vessels.

    c.   Defendant JOHN FREDERICK DAYLOR, Chief Engineer on the vessel M/V APL GULF EXPRESS, was an agent, apparent agent, servant and employee of the M/V APL GULF EXPRESS, and at all relevant times during his interactions with Plaintiff MATTHEW RUSSO, he acted within the scope of his agency and employment relationship with the M/V APL GULF EXPRESS.

    d.   Defendant JOHN FREDERICK DAYLOR, Chief Engineer on the vessel M/V APL GULF EXPRESS, was an agent, apparent agent, servant and employee of the Defendant APL MARINE SERVICES, LTD, and at all relevant times during his interactions with Plaintiff MATTHEW RUSSO, he acted within the scope of his agency and employment relationship with the Defendant APL MARINE SERVICES, LTD.

    e.   Defendant JOHN FREDERICK DAYLOR, Chief Engineer on the vessel M/V APL GULF EXPRESS, was an agent, apparent agent, servant and employee of the Defendant APL MARITIME, LTD, and at all relevant times during his interactions with Plaintiff MATTHEW RUSSO, he acted within the scope of his agency and employment relationship with the Defendant APL MARITIME, LTD.

f.  Defendant JOHN FREDERICK DAYLOR, Chief Engineer on the vessel M/V APL GULF EXPRESS, was an agent, apparent agent, servant and employee of the of Defendant AMERICAN PRESIDENT LINES, LLC., and at all relevant times during his interactions with Plaintiff MATTHEW RUSSO, he acted within the scope of his agency and employment relationship with the of Defendant AMERICAN PRESIDENT LINES, LLC.

g.  Defendant JOHN FREDERICK DAYLOR, Chief Engineer on the vessel M/V APL GULF EXPRESS, was an agent, apparent agent, servant and employee of the of Defendant CMA CGM (AMERICA) LLC, and at all relevant times during his interactions with Plaintiff MATTHEW RUSSO, he acted within the scope of his agency and employment relationship with Defendant CMA CGM (AMERICA) LLC.

h.  Defendant JOHN FREDERICK DAYLOR, Chief Engineer on the vessel M/V APL GULF EXPRESS, was an agent, apparent agent, servant and employee of the of defendant CMA CGM S.A., and at all relevant times during his interactions with Plaintiff MATTHEW RUSSO, he acted within the scope of his agency and employment relationship with Defendant CMA CGM S.A.

**The Incident**

55.  Plaintiff MATTHEW RUSSO is a 2021 graduate of the Massachusetts Maritime Academy. He graduated with an engineering degree and shortly thereafter obtained a Merchant Mariner's Credential with endorsement/ratings licensing him to work as a Third Assistant Engineer aboard U.S. flagged vessels. After graduation he signed up with the Marine Engineers Beneficial Association (MEBA) labor union.

56.  In October 2022, Plaintiff obtained a rotary job aboard the M/V APL GULF EXPRESS, through the MEBA hiring hall.

57.  On October 29, 2022, Plaintiff joined the vessel as a Third Assistant Engineer, under the direct supervision and control of Defendant JOHN FREDERICK DAYLOR, Chief Engineer aboard the M/V APL GULF EXPRESS.

58. From November 14, 2022 through January 5, 2023, Plaintiff MATTHEW RUSSO was a victim of workplace assault and battery as well as sexual harassment at the hands of Defendant Chief Engineer JOHN FREDERICK DAYLOR aboard the M/V APL GULF EXPRESS.

59. At all times relevant and material, Defendants, through their employees, agents, servants, and/or apparent agents, assigned Defendant JOHN FREDERICK DAYLOR to consistently work in close proximity to Plaintiff MATTHEW RUSSO.

60. At all times relevant and material, Defendant JOHN FREDERICK DAYLOR, during the course and scope of his employment aboard the vessel M/V APL GULF EXPRESS, and during the course and scope of his agency relationship with Defendants, used his position and work assignment to subject the Plaintiff MATTHEW RUSSO to relentless, intimidating, and damaging emotional and physical advances.

61. Upon information and belief, prior to Plaintiff embarking aboard the M/V APL GULF EXPRESS, Defendants knew Defendant Chief Engineer JOHN FREDERICK DAYLOR had subjected other crewmembers under his control and supervision to relentless, intimidating and damaging harassment, physical and emotional abuse.

62. Upon information and belief, prior to Plaintiff embarking aboard the M/V APL GULF EXPRESS, these victim crewmembers had lodged complaints against Defendant Chief Engineer JOHN FREDERICK DAYLOR, including former assistant engineer Edgar Sison. Mr. Sison complained to Defendants that Defendant Chief Engineer JOHN FREDERICK DAYLOR subjected him to relentless, intimidating and damaging harassment, physical and emotional abuse.

63. Upon information and belief, prior to Plaintiff embarking aboard the M/V APL GULF EXPRESS, APL investigated Chief Engineer JOHN FREDERICK DAYLOR for allegations of harassment, hostile work environment and battery against crewmembers under his control and supervision, including the allegations made by assistant engineer Edgar Sison.

64. Upon embarking the M/V APL GULF EXPRESS Plaintiff interacted with the Third Assistant Engineer he was relieving. The Third Assistant Engineer informed Plaintiff, Defendant Chief Engineer JOHN FREDERICK DAYLOR had a reputation for harassing and bullying new members of the engine department.

65.     Upon embarking the M/V APL GULF EXPRESS Plaintiff interacted with the Second Assistant Engineer Thomas Jackson, and the First Assistant Engineer, who informed him Defendant Chief Engineer JOHN FREDERICK DAYLOR had a habit of targeting new members of the engine department for abuse and harassment

66.     On November 14, 2022, there was an all hands, time critical job in the Engine Room. The LT cooler inlet valve had broken. During parts of the job, salt water was flowing to the Engine Room. As Plaintiff was assisting the First Assistant Engineer in removing the broken valve, Plaintiff was using an adjustable wrench. Defendant Chief Engineer JOHN FREDERICK DAYLOR was standing behind Plaintiff holding a heavy fixed wrench that was the correct size for the task (19mm metal box wrench). Instead of handing the wrench to Plaintiff, Defendant Chief Engineer JOHN FREDERICK DAYLOR, during the course and scope of his employment and agency relationship with Defendants, struck Plaintiff forcefully in the side of Plaintiff's head three times in quick succession. At all relevant and material times, the vessel's First Assistant Engineer witnessed Defendant Chief Engineer JOHN FREDERICK DAYLOR striking Plaintiff in the head with the wrench.

67.     Approximately a week after the incident of November 14, 2022, during maneuvering at around 2 – 3 AM, Plaintiff was assigned to work alone alongside Defendant Chief Engineer JOHN FREDERICK DAYLOR, in the Engine Control Room. Plaintiff was sitting in front of the monitors, while Defendant Chief Engineer JOHN FREDERICK DAYLOR was sitting on the other side of the Engine Control Room in front of his computer. Plaintiff was doing a Sudoku puzzle in his notebook. Defendant Chief Engineer JOHN FREDERICK DAYLOR asked him from across the room what Plaintiff was doing and Plaintiff responded, "a Sudoku puzzle."  Defendant Chief Engineer JOHN FREDERICK DAYLOR, during the course and scope of his employment and agency relationship with Defendants, stood up from his seat walked over to Plaintiff and leaned his crotch and stomach on Plaintiff's shoulder, neck and back area. Defendant Chief Engineer JOHN FREDERICK DAYLOR put so much of his body weight onto Plaintiff that it forced Plaintiff to lean more into him to prevent himself from falling over. With his crotch and belly draped over Plaintiff, Defendant Chief Engineer JOHN FREDERICK DAYLOR, during the course and scope of his employment

and agency relationship with Defendants, said in a hostile manner "Do you know everything about this power plant?" Plaintiff replied, "No." Defendant Chief Engineer JOHN FREDERICK DAYLOR said with the same tone: "Do you know how every piece of machinery in the engine room works?" Plaintiff replied, "No." Defendant Chief Engineer JOHN FREDERICK DAYLOR exploded and yelled, "Then put the [expletive] game away!" Plaintiff did as instructed.  Defendant Chief Engineer JOHN FREDERICK DAYLOR then walked away and sat back down. Plaintiff was in shock and scared.

68.     Subsequently, on a later date, Plaintiff was assigned to work alongside Defendant Chief Engineer JOHN FREDERICK DAYLOR in the Engine Control Room at approximately 4 – 5 AM. Defendant Chief Engineer JOHN FREDERICK DAYLOR complained about pain in the palm of his hand. Defendant Chief Engineer JOHN FREDERICK DAYLOR, during the course and scope of his employment and agency relationship with Defendants, walked over to the Plaintiff an placed his palm in front of his face saying: "Go ahead, rub it." "No," said Plaintiff. Defendant Chief Engineer JOHN FREDERICK DAYLOR kept the palm of his hand on Plaintiff's face, demanding Plaintiff rub the palm of his hand and saying "Just feel it!." Plaintiff responded, "Get your hand out of my face right now." Plaintiff reported the incident to other members of the Engine Department at a coffee break the next day.

69.     Subsequently, on a later date, Plaintiff was assigned to work alongside Defendant Chief Engineer JOHN FREDERICK DAYLOR in the Engine Control Room. Defendant Chief Engineer JOHN FREDERICK DAYLOR told Plaintiff a story about his grandson getting his penis caught in the zipper of his pants when he was a younger child. Defendant Chief Engineer JOHN FREDERICK DAYLOR was graphic with the details, telling Plaintiff what he had to do to help the boy remove his penis from his zipper.  Defendant Chief Engineer JOHN FREDERICK DAYLOR, during the course and scope of his employment and agency relationship with Defendants, proceeded to ask Plaintiff if his penis or testicles had ever been stuck in his zipper.

70.     Subsequently, on a later date, Plaintiff was assigned to work alongside Defendant Chief Engineer JOHN FREDERICK DAYLOR in the Engine Control Room. Defendant Chief Engineer JOHN FREDERICK DAYLOR, during the course and scope of his employment and

agency relationship with Defendants, shared with Plaintiff intimate details about his sex life, describing intimate details about his wife's grooming and genitals.

71.     Subsequently, on a later date, most of the Engine Department was gathered together in the Engine Control Room during a coffee break. Plaintiff was wearing company coveralls, and the soft shoulder board fabric was unbuttoned on his right shoulder. Defendant Chief Engineer JOHN FREDERICK DAYLOR, during the course and scope of his employment and agency relationship with Defendants, told Plaintiff his shoulder board was unbuttoned, grabbed Plaintiff's shoulder and started trying to bottun it for Plaintiff, without Plaintiff's consent.

72.     On or about December 27, 2022, Plaintiff was seated next to the other Third Assistant Engineer, Second Assistant Engineer Thomas Jackson, Second Mate William Murphy, and Defendant Chief Engineer JOHN FREDERICK DAYLOR, for dinner at the Officer's Mess Hall. The group discussed the new Coast Guard regulation requiring all US Flagged vessels to be equipped with cameras in common areas and passageways for the safety of crew and cadets due to the many rapes and sexual assaults occurring on ships. Defendant Chief Engineer JOHN FREDERICK DAYLOR, during the course and scope of his employment and agency relationship with Defendants, said to everyone, "That's too bad for us, the longer [Plaintiff's] hair gets every day, the more rape-able he looks."

73.     On or about January 2, 2023, at approximately 1715, Plaintiff was working out in the gym. The Chief Mate Koutaiba Saad was in the gym on the elliptical at the same time. Plaintiff was doing ab-wheel roll outs when Defendant Chief Engineer JOHN FREDERICK DAYLOR opened the door and took a step in. The Chief Mate Koutaiba Saad said "come in and work out Chief." Defendant Chief Engineer JOHN FREDERICK DAYLOR, during the course and scope of his employment and agency relationship with Defendants, replied: "No chance in Hell! I'm just here looking at [Plaintiff's] ass."

74.     On or about January 3, 2023, an alarm went off in the engine room. Plaintiff went to the control room to silence the alarm. Defendant Chief Engineer JOHN FREDERICK DAYLOR was standing at the control panel looking at the alarm next to Plaintiff. Defendant Chief Engineer JOHN FREDERICK DAYLOR, during the course and scope of his employment and agency

relationship with Defendants, grabbed Plaintiff, pulling him into his body, and screamed at Plaintiff's face, "You better not be [expletive] welding while we're bunkering!" Plaintiff lunged back to free himself from Defendant's hands yelling back, "Get your hands off me right now!" Plaintiff was terrified, running out of the control room to the Machine Shop to calm himself from shock.

75.     Later that day, Plaintiff confronted Defendant Chief Engineer JOHN FREDERICK DAYLOR at the control room, telling him he was sick of his constant abuse. Defendant Chief Engineer JOHN FREDERICK DAYLOR proceeded to admit everything he had done and apologized. He said, "It's not going to happen again, ever. I'm sorry it happened."

76.     Plaintiff then went to the First Assistant Engineer to report what happened informing him that he wanted to report Defendant Chief Engineer JOHN FREDERICK DAYLOR to the Captain.

77.     Plaintiff submitted a written report to the Captain and then met with him. When discussing Defendant Chief Engineer JOHN FREDERICK DAYLOR's attack with the wrench, the Captain responded, "I don't believe he really did this stuff to you."

78.      Plaintiff reiterated he did not feel safe being on the ship with Defendant Chief Engineer JOHN FREDERICK DAYLOR and demanded that Defendant Chief Engineer JOHN FREDERICK DAYLOR be disembarked. Plaintiff also suggested moving the existing engineers up a rank; First Assistant Engineer to Chief Engineer, Second Assistant Engineer to First Assistant Engineer and Third Assistant Engineer to Second Assistant Engineer. The Captain said it would not be possible.

79.     The Captain also rejected Plaintiff's proposal explaining that neither Plaintiff nor Defendant Chief Engineer JOHN FREDERICK DAYLOR could get off the ship at that time. If either of them left the ship, they could be detained by local law enforcement (the ship was in Jebel Ali, UAE), for lacking a transit visa. The Captain then represented to the Plaintiff Defendant Chief Engineer JOHN FREDERICK DAYLOR did not have a transit visa. The Captain then confirmed to the Plaintiff that his only options were to remain confined in the ship with the man who had been harassing and assaulting him for the past 3 months or quit and be detained in a foreign country.

80.     Plaintiff received no updates from the Captain the rest of the day, or the day after. No attempts were made to isolate Defendant Chief Engineer JOHN FREDERICK DAYLOR from Plaintiff. Plaintiff ran into Defendant Chief Engineer JOHN FREDERICK DAYLOR during breakfast and lunch at the Officer's Mess Hall.

81.     At the advice of the First Assistant Engineer, Plaintiff returned to see the Captain at his office asking for updates. The Captain reported there were no updates.

82.     Later that day, Plaintiff returned to the Captain's office and reiterated he did not want to be stuck on the ship with the supervisor who had been bullying, harassing, sexually harassing, and assaulting him any longer. Plaintiff asked the Captain for access to the satellite phone to report Defendant Chief Engineer JOHN FREDERICK DAYLOR to the company, by calling the Designated Person Ashore (DPA). Instead of giving Plaintiff immediate access to the phone, the Captain pressured him not to contact the company: a) asking numerous times if Plaintiff was sure he wanted to make the call; b) stating it was too early in the morning in the United States and he would be walking people up; c) stating Plaintiff was making a mistake.

83.     After Plaintiff reiterated his desire to report Defendant Chief Engineer JOHN FREDERICK DAYLOR to the company, the Captain relented allowing Plaintiff to use the satellite phone.

84.     Using the satellite phone Plaintiff was connected with the Designated Person Ashore (DPA) and a Maritime Labor Convention representative. After Plaintiff reported the incident verbally to them, both indicated this was the first time they had heard about it – indicating the Captain had failed to report the incident to the company. The company shoreside representatives asked Plaintiff to scan and e-mail them the statement. After reading the statement, the company shoreside representatives informed Plaintiff an investigation had been opened.

85.     During the conversation, the Captain informed the Designated Person Ashore (DPA) and a Maritime Labor Convention representative that moving the engineers up a rank was possible and that he had a visa for the Chief Engineer, allowing him to disembark – both statements contrary to what the Captain had represented to the Plaintiff two days before.

86. The next day, January 5, Defendant Chief Engineer JOHN FREDERICK DAYLOR disembarked the ship.

87. The combination of Defendant Chief Engineer JOHN DAYLOR's continuous workplace sexual harassment, assault, and battery (both physical and verbal) is resulting in long term and serious bodily injury and emotional trauma to Plaintiff MATTHEW RUSSO.

88. Defendant Chief Engineer JOHN DAYLOR's continuous workplace sexual harassment, assault, and battery targeted at Plaintiff MATTHEW RUSSO was that of "a savage and vicious nature" such that the vessel became a "perilous place" culminating in a breach of the warranty of seaworthiness pursuant to the longstanding binding Supreme Court precedent set forth in *Boudoin v. Lykes Bros. S.S. Co.,* 348 U.S. 336, 340 (1955). Defendant Chief Engineer JOHN FREDERICK DAYLOR's actions fell outside of the "customary standards of the calling" such that the totality of his actions demonstrated his wickedness, evil, and savagery rendering the M/V APL GULF EXPRESS unseaworthy as a matter of law, and the Defendant(s) vessel owner(s) strictly liable to the Plaintiff. *Id.*

89. At all times material, Plaintiff MATTHEW RUSSO's shipboard supervisors on the M/V APL GULF EXPRESS and vessel leadership, including the Captain/Master, Chief Mate, Second Mate, First Assistant Engineer, Second Assistant Engineer, and Third Assistant Engineer, knew or should have known upon a reasonable inquiry and inspection 1) Defendant Chief Engineer JOHN FREDERICK DAYLOR reputation and pre-disposition to harass and assault crewmembers under his supervision and control, and 2) Defendant Chief Engineer JOHN FREDERICK DAYLOR's conduct, sexual harassment, assault and battery of Plaintiff between November 14, 2022, through January 5, 2023. As such, at all times material, Plaintiff MATTHEW RUSSO's shipboard supervisors on the M/V APL GULF EXPRESS and vessel leadership, had actual and/or constructive notice of Defendant Chief Engineer JOHN FREDERICK DAYLOR's history and vicious nature toward Plaintiff. These supervisors, one being Plaintiff's MATTHEW RUSSO's perpetrator, nevertheless persisted in assigning Plaintiff MATTHEW RUSSO to work in close proximity to, in direct contact with, and at times solely with Defendant Chief Engineer JOHN FREDERICK DAYLOR:

a. Upon embarking the M/V APL GULF EXPRESS Plaintiff interacted with the Third Assistant Engineer he was relieving. The Third Assistant Engineer informed Plaintiff, Defendant Chief Engineer JOHN FREDERICK DAYLOR had a reputation for harassing and bullying new members of the engine department.

b. Upon embarking the M/V APL GULF EXPRESS Plaintiff interacted with the Second Assistant Engineer Thomas Jackson, and the First Assistant Engineer, who informed him Defendant Chief Engineer JOHN FREDERICK DAYLOR had a habit of targeting new members of the engine department for abuse and harassment.

c. Chief Engineer JOHN FREDERICK DAYLOR's was an eyewitness to his own conduct, sexual harassment, assault and battery of Plaintiff between November 14, 2022, through January 5, 2023.  As the head of the Engine Department, Plaintiff's highest ranked Engine Department supervisor, and a member of vessel leadership, his knowledge is imputed to the vessel owners and Plaintiff's employers. Pursuant to SMS Policies and Procedures, Chief Engineer JOHN FREDERICK DAYLOR had a duty to report and document his own misconduct to the vessel's master/captain and APL shoreside leadership. Chief Engineer JOHN FREDERICK DAYLOR did not report or document his misconduct with the vessel's master/captain and APL shoreside leadership;

d. On November 14, 2022, the First Assistant Engineer witnessed Defendant Chief Engineer JOHN FREDERICK DAYLOR striking Plaintiff with a wrench forcefully in the side of Plaintiff's head three times in quick succession. As a member of vessel leadership and Plaintiff's immediate supervisor, the First Assistant Engineer's knowledge is imputed to the vessel owners and Plaintiff's employers. Pursuant to SMS Policies and Procedures, the First Assistant Engineer had a duty to report and document Chief Engineer JOHN FREDERICK DAYLOR actions to the vessel's master/captain. First Assistant Engineer did not report or document Chief Engineer JOHN FREDERICK DAYLOR's misconduct with the vessel's master/captain;

e. On a later date, licensed and unlicensed members of the Engine Department gathered at the control room, witnessed Defendant Chief Engineer JOHN FREDERICK DAYLOR

22

grab Plaintiff's shoulder and attempting to button Plaintiff's coveralls, without Plaintiff's consent. As a member of vessel leadership, pursuant to SMS policies all licensed members of the Engineering Department and Deck Department, had a duty to report and document Defendant Chief Engineer JOHN FREDERICK DAYLOR actions to the vessel's master/captain, but failed to do so. Their knowledge is also imputed to the vessel owner and Plaintiff's employer;

f.  On or about December 27, 2022, Plaintiff was seated next to the other Third Assistant Engineer, Second Assistant Engineer Thomas Jackson, Second Mate William Murphy, and  Defendant Chief Engineer JOHN FREDERICK DAYLOR, for dinner at the Officer's Mess Hall. The group discussed the new Coast Guard regulation requiring all US Flagged vessels to be equipped with cameras in common areas and passageways for the safety of crew and cadets due to the many rapes and sexual assaults occurring on ships. Defendant Chief Engineer JOHN FREDERICK DAYLOR, during the course and scope of his employment and agency relationship with Defendants, said to everyone, "That's too bad for us, the longer [Plaintiff's] hair gets every day, the more rape-able he looks." As a members of vessel leadership (and in the case of the Second Assistant Engineer - Plaintiff's immediate supervisor), pursuant to SMS policies these eyewitnesses had a duty to report and document Chief Engineer JOHN FREDERICK DAYLOR actions to the vessel's master/captain, but failed to do so. Their knowledge is also imputed to the vessel owner and Plaintiff's employer;

g.  On or about January 2, 2023, Chief Mate Koutaiba Saad witnessed Defendant Chief Engineer JOHN FREDERICK DAYLOR, in response to his invitation to work out at the gym, saying: "No chance in Hell! I'm just here looking at [Plaintiff's] ass." As a member of vessel leadership (and in particular, the vessel's second in command after the captain/master), Chief Mate Koutaiba Saad's knowledge is imputed to the vessel owners and Plaintiff's employers. Pursuant to SMS Policies and Procedures, Chief Mate Koutaiba Saad had a duty to report and document Chief Engineer JOHN FREDERICK DAYLOR actions to the vessel's master/captain, but failed to do so;

23

h. On January 3, 2023, Plaintiff reported Defendant Chief Engineer JOHN FREDERICK DAYLOR's misconduct to the First Assistant Engineer who urged Plaintiff to report him in writing to the Captain/Master. Plaintiff submitted a written report to the Captain/Master. Pursuant to SMS Policies and Procedures, the Captain/Master had duty to immediately document and report Plaintiff's complaint, by forwarding it to company shoreside management including the Designated Person Ashore. Instead, in violation of the vessel's SMS Policies and Procedures, the Captain/Master pressured Plaintiff not to report the incident to management and challenged the veracity of the report, when made. For the next two days, Plaintiff had to work in close proximity with the department head that had terrorized, bullied, and assaulted him;

i. Shipboard employees, shoreside employees, and other agents of the Defendants knew and/or should have known of prior reports or incidents involving Defendant Chief Engineer JOHN FREDERICK DAYLOR's harassment, intimidation, and potential assault of other crewmembers; and,

j. Shipboard employees, shoreside employees, and other agents of Defendants recklessly disregarded Defendant Chief Engineer JOHN FREDERICK DAYLOR's violent behavior toward other crewmembers and discouraged Plaintiff MATTHEW RUSSO's official reporting of workplace harassment, assault, and battery stating that doing so would be an inconvenience in "waking people up" and that it was "a mistake."

k. Shipboard employees, shoreside employees, and other agents of Defendants tolerated and allowed a culture of silence and suppression of complaints, shielding perpetrators of workplace harassment, assaults, and batteries. Defendants additionally failed to implement adequate policies and procedures, including adequate training of shipboard management, to proactively protect crewmembers from workplace harassment, assaults, and batteries, including adequate reporting mechanisms while at the same time isolating and ostracizing victims.

l. Shipboard employees, shoreside employees, and other agents of Defendants tolerated and allowed a culture of silence and suppression of complaints, shielding perpetrators of

Complaint
Jury Trial Demand

workplace harassment, assaults, and batteries, while at the same time isolating and ostracizing victims.

90.     At all times relevant and material, APL shoreside executives and company leaders knew or should have known upon a reasonable inquiry and inspection Defendant Chief Engineer JOHN FREDERICK DAYLOR reputation and pre-disposition to harass and assault crewmembers under his supervision and control, prior to Plaintiff embarking on the M/V APL GULF EXPRESS:

    a.  Upon information and belief, prior to Plaintiff embarking aboard the M/V APL GULF EXPRESS, Defendants knew Defendant Chief Engineer JOHN FREDERICK DAYLOR had subjected other crewmembers under his control and supervision to relentless, intimidating and damaging harassment, physical and emotional abuse.

    b.  Upon information and belief, prior to Plaintiff embarking aboard the M/V APL GULF EXPRESS, these victim crewmembers had lodged complaints against Defendant Chief Engineer JOHN FREDERICK DAYLOR, including former assistant engineer Edgar Sison. Mr. Sison complained to Defendants that Defendant Chief Engineer JOHN FREDERICK DAYLOR subjected him to relentless, intimidating and damaging harassment, physical and emotional abuse.

    c.  Upon information and belief, prior to Plaintiff embarking aboard the M/V APL GULF EXPRESS, APL investigated Chief Engineer JOHN FREDERICK DAYLOR for allegations of harassment, hostile work environment and battery against crewmembers under his control and supervision, including the allegations made by assistant engineer Edgar Sison.

91.     On July 31, 2024, the United States Coast Guard initiated an administrative proceeding by filing a Complaint, seeking a revocation of Defendant Chief Engineer JOHN FREDERICK DAYLOR's Merchant Mariner's Credential. The Coast Guard's Complaint refers to Defendant Chief Engineer JOHN FREDERICK DAYLOR as "Respondent." The Coast Guard Complaint includes allegations concerning 1) Defendant Chief Engineer JOHN FREDERICK DAYLOR's actions of harassment and assault towards other crewmembers on APL vessels, prior to Plaintiff embarking on the M/V APL GULF EXPRESS, and 2) Defendant Chief Engineer JOHN

25

FREDERICK DAYLOR's actions of harassment and assault towards Plaintiff. The Coast allegations include:

    a. On June 26th, 2022, Respondent was employed by APL Maritime LTD and subject to APL Maritime LTD's policies.

    b. On June 26th, 2022, APL Maritime LTD had a policy of conduct that prohibiting abusive language and aggressive attitudes towards fellow crewmembers.

    c. On June 26th, 2022, Respondent asked the 2nd engineer what he was doing, the 2nd engineer responded he was looking for a tool and respondent aggressively grabbed the 2nd engineer and dragged him across the workshop to where the tool was located in violation of APL Code of Conduct, Document CPOM-015.USF, 3.8 Behavior Toward Others.

    d. Respondent's violation of APL Code of Conduct, Document CPOM-015.USF, 3.8 Behavior Toward Others is Misconduct as described by 46 U.S.C. §7703(1)(B) and defined by 46 CFR §5.27.

    e. On or about November 14, 2022, Respondent was the Chief Engineer on the MV APL GULF EXPRESS (O.N. 1275899) while the vessel was within a special maritime and territorial jurisdiction of the United States.

    f. On or about November 14, 2022, Respondent was observing the 3rd engineer using an adjustable wrench and while standing behind him, Respondent struck the 3rd engineer 3 times on the side of the head with another wrench.

    g. Respondent's actions are assault within maritime and territorial jurisdiction as defined in 6 Am.Jur. 2d Assault and Battery § 1 and applicable under 18 U.S.C. § 113.

    h. Violation of 18 U.S.C. § 113 is a violation of a law or regulation intended to promote marine safety as described in 46 U.S.C. § 7703(1)(A) and defined by 46 CFR §5.33.

    i. On or about December 27, 2022, Respondent made an unwelcome verbal comment of a sexual nature to a crewmember when the engineering crew were discussing the addition of cameras to vessels because of rape cases at sea, and Respondent stated that was too bad because the longer the crewmember's hair became the more "rape-able" he looked.

j.   On or about January 2, 2023, Respondent made an unwelcome verbal comment of a sexual nature to a crewmember when Respondent stated he was there to watch the crewmember's "ass" while the crewmember was performing exercises in the ship's gym.

k.   On or about January 3, 2023, while in the control room Respondent grabbed the 3rd engineer by the arm and forcefully pulled him close to Respondent's body, while yelling at him aggressively.

l.   Between October 29, 202[2] to January 4th, 2023, Respondent made several intentional and unwelcome verbal comments of a sexual nature to a crewmember, to include asking the crewmember if he had ever had his penis stuck in the zipper of his pants and telling the crewmember about Respondent's sex life with Respondent's wife.

m.   Respondent's comments toward the crewmember were intentional unwelcomed verbal comments of a sexual nature directed toward the crewmember, when Respondent was the crewmember's supervisor.

n.   Respondent's actions towards the crewmember are acts of sexual harassment in violation of 46 U.S.C. § 7704a(a), as defined in 46 U.S.C. § 2101(46)(C).

o.   In aggravation: Respondent was a direct supervisor to the crewmember.

p.   In aggravation: On January 4th, 2023, Respondent was discharged for cause from APL employment because, while he was the subject of an investigation for his June 26, 2022, acts against the 2nd engineer for violations of company code of conduct, Respondent continued his behavior of harassment, bullying and physical contact with crewmembers, creating a hostile working environment in violation of APL Code of Conduct, Section "Behavior Towards Others".

92.   On August 10, 2024, Defendant Chief Engineer JOHN FREDERICK DAYLOR voluntarily surrendered his Merchant Mariners Credential.

93.   As a direct and proximate result of Defendant Chief Engineer JOHN FREDERICK DAYLOR's sexual harassment and physical assault and battery, Plaintiff MATTHEW RUSSO suffered coronary artery spasms, angina, mental and emotional anguish as well as insomnia. Plaintiff MATTHEW RUSSO has suffered physical manifestations of harm, physical pain, mental suffering,

27

mental anguish, loss of enjoyment of life, impairment inconvenience in the normal pursuits of life, feelings of economic insecurity caused by disability, aggravations of any previously existing conditions therefrom, incurred medical expenses in the care and treatment of his injuries, including psychological and psychiatric care, medications, lost wages, income lost in the past and his working ability and earning capacity has been impaired. The injuries and damages sustained by Plaintiff MATTHEW RUSSO are permanent and continuing in nature, and Plaintiff MATTHEW RUSSO will suffer losses and impairments in the future.

**FIRST CAUSE OF ACTION**
***JONES ACT NEGLIGENCE***
**AGAINST DEFENDANTS APL MARITIME LTD, APL MARINE SERVICES, LTD, AMERICAN PRESIDENT LINES, LLC, CMA CGM (AMERICA) LLC and CMA-CGM S.A. IN THEIR CAPACITY AS EMPLOYERS OF PLAINTIFF MATTHEW RUSSO ("THE JONES ACT DEFENDANTS")**

94.     Plaintiffs re-allege, adopt, and incorporate by reference the allegations in paragraphs 1- 93 as though alleged originally herein.

95.     This is a seaman's personal injury action arising under 46 U.S.C. § 30104 et seq. (commonly known as the "Jones Act"), providing that a "seaman injured in the course of employment or, if the seaman dies from the injury, the personal representative of the seaman may bring a civil action at law, with the right of trial by jury against the employer."

96.     At all times relevant and material, Plaintiff MATTHEW RUSSO was employed as a seaman and as a member of the crew on the vessel M/V APL GULF EXPRESS, which was in navigable waters.

97.     Terms such as "seaman" and "vessel" have a wide range of meaning; as such, only a jury or trier of facts can determine their application. (*Estate of Wenzel v. Seaward Marine Services, Inc.*, 709 F.2d 1326, 1327 (9th Cir.1983).) Where there is evidence supporting seaman status, the determination of whether an injured employee is a seaman covered by the Jones Act is a question of fact for the jury. (*McDermott Inc. v. Wilander*, 498 U.S. 337, 350 (1991).)

98.     At all times relevant and material Plaintiff MATTHEW RUSSO was an employee and/or borrowed servant of Defendants APL MARITIME LTD, APL MARINE SERVICES, LTD, AMERICAN PRESIDENT LINES, LLC, CMA CGM (AMERICA) LLC and CMA-CGM S.A.

(hereinafter for purposes of the First Cause of Action against Defendants collectively referred to as the "JONES ACT DEFENDANTS").

99.    In his capacity as Third Assistant Engineer, Plaintiff MATTHEW RUSSO's duties contributed to the function of a vessel in navigation and the accomplishment of its mission. These contributions were substantial both in duration and nature.

100.    Pursuant to the Jones Act, the JONES ACT DEFENDANTS, had a non-delegable duty to provide Plaintiff MATTHEW RUSSO a safe work environment, free of hazards, including a workplace free of workplace sexual harassment, assaults, and batteries.

101.    At all times material, the JONES ACT DEFENDANTS owed Plaintiff MATTHEW RUSSO a duty to exercise reasonable and ordinary care to keep and maintain the premises in which Plaintiff MATTHEW RUSSO lived and worked (i.e. the M/V APL GULF EXPRESS) in a safe condition.

102.    At all times material, Defendant Chief Engineer JOHN FREDERICK DAYLOR was an employee, agent, apparent agent, servant and/or borrowed servant of the JONES ACT DEFENDANTS.

103.    At all times material, Defendant Chief Engineer JOHN FREDERICK DAYLOR was the head of the Engineering Department aboard the M/V APL GULF EXPRESS, and Plaintiff MATTHEW RUSSO's supervisor.

104.    At all times material, in all of his interactions with Plaintiff MATTHEW RUSSO, Defendant Chief Engineer JOHN FREDERICK DAYLOR acted in the course and scope of his employment with the JONES ACT DEFENDANTS.

105.    At all times material, Defendant Chief Engineer JOHN FREDERICK DAYLOR, sexually harassed, assaulted and battered Plaintiff MATTHEW RUSSO during the course and scope of his employment and/or agency relationship with the JONES ACT DEFENDANTS. As a result, the JONES ACT DEFENDANTS are vicariously liable for the torts of Defendant Chief Engineer JOHN FREDERICK DAYLOR.

106.    Furthermore, the JONES ACT DEFENDANTS owed a duty of reasonable care to Plaintiff. Plaintiff MATTHEW RUSSO's resulting injuries are due to the direct fault and direct

negligence of the JONES ACT DEFENDANTS, their agents, servants, and/or employees. These JONES ACT DEFENDANTS, their agents, apparent agents, servants, and/or employees, breached their duty of care, in the following manner:

    a.  Failing to provide Plaintiff MATTHEW RUSSO a reasonable place to work;

    b.  Failing to keep and maintain the vessel in a reasonably safe condition;

    c.  Negligently allowing the creation of an intimidating, hostile and offensive work environment, in which Plaintiff MATTHEW RUSSO was sexually harassed and assaulted;

    d.  Negligently allowing the creation of an intimidating, hostile and offensive work environment, in which shipboard officers failed to take appropriate timely actions in response to Plaintiff MATTHEW RUSSO's sexual harassment and assault complaints;

    e.  Failing to implement adequate security policies, measures, and procedures, necessary to protect crewmembers;

    f.  Failing to hire and/or retain and/or train competent crewmembers, including shipboard supervisors;

    g.  Failing to take additional security measures after being put on notice that Defendant Chief Engineer JOHN FREDERICK DAYLOR had a history of sexually harassing and bullying members of the crew, particularly new and younger engineers;

    h.  Failing to timely discipline and/or fire and/or dismiss Defendant Chief Engineer JOHN FREDERICK DAYLOR after being on notice that on June 26, 2022 (before Plaintiff embarked on the vessel),  Defendant Chief Engineer JOHN FREDERICK DAYLOR had harassed, assaulted and bullied other crewmembers;

    i.  Failing to timely discipline and/or fire and/or dismiss Defendant Chief Engineer JOHN FREDERICK DAYLOR after Plaintiff MATTHEW RUSSO reported to the JONES ACT DEFENDANTS, via their agents and servants, including vessel leadership, that Defendant Chief Engineer JOHN FREDERICK DAYLOR had sexually harassed and assaulted him;

Complaint
Jury Trial Demand

j.  Failing to implement measures to isolate Defendant Chief Engineer JOHN FREDERICK DAYLOR and preventing him from working in close proximity with Plaintiff, after Plaintiff's supervisors and other members of vessel leadership (Captain/Master, First Assistant Engineer, Second Assistant Engineer, Chief Mate, Second Mate), witnessed and learned about Defendant Chief Engineer JOHN FREDERICK DAYLOR's assault, sexual harassment, and bullying of Plaintiff;

k.  Failing to use reasonable care to ensure the vessel had competent and adequately trained crew, including managers and supervisors capable of handling and properly addressing crewmember sexual harassment and assault complaints;

l.  Failing to take feasible and reasonable steps to eliminate the dangerous conditions which were known by the Defendants and which, in the exercise of reasonable care, should have been known by the Defendants;

m.  Enabling Defendant Chief Engineer JOHN FREDERICK DAYLOR's reign of terror and victimization of Plaintiff – despite being on notice of his dangerous propensities - leading to acts in violation of APL's Code of Conduct, Document CPOM-015.USF, 3.8 Behavior Toward Others is Misconduct as described by 46 U.S.C. §7703(1)(B) and defined by 46 CFR §5.27;

n.  Enabling Defendant Chief Engineer JOHN FREDERICK DAYLOR's reign of terror and victimization of Plaintiff – despite being on notice of his dangerous propensities - leading to acts in violation of 18 U.S.C. § 113 a law or regulation intended to promote marine safety as described in 46 U.S.C. § 7703(1)(A) and defined by 46 CFR §5.33;

o.  Enabling Defendant Chief Engineer JOHN FREDERICK DAYLOR's reign of terror and victimization of Plaintiff – despite being on notice of his dangerous propensities - leading to acts of sexual harassment in violation of 46 U.S.C. § 7704a(a), as defined in 46 U.S.C. § 2101(46)(C).

p.  Enabling Defendant Chief Engineer JOHN FREDERICK DAYLOR's reign of terror and victimization of Plaintiff – despite being on notice of his dangerous propensities -

leading to acts of physical assault within maritime and territorial jurisdiction as defined in 6 Am.Jur. 2d Assault and Battery § 1 and applicable under 18 U.S.C. § 113.

q.   Enabling Defendant Chief Engineer JOHN FREDERICK DAYLOR's reign of terror and victimization of Plaintiff – despite being on notice of his dangerous propensities - leading to acts in violation of the SMS and APL's Code of Conduct, including Document CPOM-015.USF, 3.8 Behavior Toward Others.

107.   Plaintiff MATTHEW RUSSO worksite lacked the site safety precautions available to comparable workers in comparable land-based jobs.

108.   The JONES ACT DEFENDANTS knew of the forgoing conditions which caused the Plaintiff's harm and did not correct them, or the conditions existed for a sufficient length of time so that the JONES ACT DEFENDANTS, in the exercise of reasonable care should have learned of them and corrected them.

109.   At all times material, Plaintiff MATTHEW RUSSO's shipboard supervisors on the M/V APL GULF EXPRESS and vessel leadership, including the Captain/Master, Chief Mate, Second Mate, First Assistant Engineer, Second Assistant Engineer, and Third Assistant Engineer, knew or should have known upon a reasonable inquiry and inspection 1) Defendant Chief Engineer JOHN FREDERICK DAYLOR reputation and pre-disposition to harass and assault crewmembers under his supervision and control, and 2)  Defendant Chief Engineer JOHN FREDERICK DAYLOR's conduct, sexual harassment, assault and battery of Plaintiff between November 14, 2022, through January 5, 2023. As such, at all times material, Plaintiff MATTHEW RUSSO's shipboard supervisors on the M/V APL GULF EXPRESS and vessel leadership, had actual and/or constructive notice of Defendant Chief Engineer JOHN FREDERICK DAYLOR's history and vicious nature toward Plaintiff. These supervisors, one being Plaintiff's MATTHEW RUSSO's perpetrator, nevertheless persisted in assigning Plaintiff MATTHEW RUSSO to work in close proximity to, in direct contact with, and at times solely with Defendant Chief Engineer JOHN FREDERICK DAYLOR:

a.   Upon embarking the M/V APL GULF EXPRESS Plaintiff interacted with the Third Assistant Engineer he was relieving. The Third Assistant Engineer informed Plaintiff,

32

Defendant Chief Engineer JOHN FREDERICK DAYLOR had a reputation for harassing and bullying new members of the engine department;

b.   Upon embarking the M/V APL GULF EXPRESS Plaintiff interacted with the Second Assistant Engineer Thomas Jackson, and the First Assistant Engineer, who informed him Defendant Chief Engineer JOHN FREDERICK DAYLOR had a habit of targeting new members of the engine department for abuse and harassment;

c.   Chief Engineer JOHN FREDERICK DAYLOR's was an eyewitness to his own conduct, sexual harassment, assault and battery of Plaintiff between November 14, 2022, through January 5, 2023, which as the head of the Engine Department, Plaintiff's highest ranked Engine Department supervisor, and a member of vessel leadership, his knowledge is imputed to the vessel owners and Plaintiff's employers. Pursuant to SMS Policies and Procedures, Chief Engineer JOHN FREDERICK DAYLOR had a duty to report and document his own misconduct to the vessel's master/captain and APL shoreside leadership. Chief Engineer JOHN FREDERICK DAYLOR did not report or document his misconduct with the vessel's master/captain and APL shoreside leadership;

d.   On November 14, 2022, the First Assistant Engineer witnessed Defendant Chief Engineer JOHN FREDERICK DAYLOR striking Plaintiff with a wrench forcefully in the side of Plaintiff's head three times in quick succession. As a member of vessel leadership and Plaintiff's immediate supervisor, the First Assistant Engineer's knowledge is imputed to the vessel owners and Plaintiff's employers. Pursuant to SMS Policies and Procedures, the First Assistant Engineer had a duty to report and document Chief Engineer JOHN FREDERICK DAYLOR actions to the vessel's master/captain. The First Assistant Engineer did not report or document Chief Engineer JOHN FREDERICK DAYLOR's misconduct with the vessel's master/captain;

e.   On a later date, licensed and unlicensed members of the Engine Department gathered at the control room, witnessed Defendant Chief Engineer JOHN FREDERICK DAYLOR grab Plaintiff's shoulder and attempting to button Plaintiff's coveralls, without Plaintiff's consent. As a member of vessel leadership, pursuant to SMS policies all licensed

33

members of the Engineering Department, had a duty to report and document Chief Engineer JOHN FREDERICK DAYLOR actions to the vessel's master/captain, but failed to do so. Their knowledge is imputed to the vessel owners and Plaintiff's employers;

f.   On or about December 27, 2022, Plaintiff was seated next to the other Third Assistant Engineer, Second Assistant Engineer Thomas Jackson, Second Mate William Murphy, and Defendant Chief Engineer JOHN FREDERICK DAYLOR, for dinner at the Officer's Mess Hall. The group discussed the new Coast Guard regulation requiring all US Flagged vessels to be equipped with cameras in common areas and passageways for the safety of crew and cadets due to the many rapes and sexual assaults occurring on ships. Defendant Chief Engineer JOHN FREDERICK DAYLOR, during the course and scope of his employment and agency relationship with Defendants, said to everyone, "That's too bad for us, the longer [Plaintiff's] hair gets every day, the more rape-able he looks." As a members of vessel leadership (and in the case of the Second Assistant Engineer - Plaintiff's immediate supervisor), pursuant to SMS policies these eyewitnesses had a duty to report and document Chief Engineer JOHN FREDERICK DAYLOR actions to the vessel's master/captain, but failed to do so. Their knowledge is imputed to the vessel owner and Plaintiff's employer;

g.   On or about January 2, 2023, Chief Mate Koutaiba Saad witnessed Defendant Chief Engineer JOHN FREDERICK DAYLOR, in response to his invitation to work out at the gym, saying: "No chance in Hell! I'm just here looking at [Plaintiff's] ass." As a member of vessel leadership (and in particular, the vessel's second in command after the captain/master), Chief Mate Koutaiba Saad's knowledge is imputed to the vessel owners and Plaintiff's employers. Pursuant to SMS Policies and Procedures, Chief Mate Koutaiba Saad had a duty to report and document Chief Engineer JOHN FREDERICK DAYLOR actions to the vessel's master/captain, but failed to do so;

h.   On January 3, 2023, Plaintiff reported Chief Engineer JOHN FREDERICK DAYLOR's misconduct to the First Assistant Engineer who urged Plaintiff to report him in writing

34

to the Captain/Master. Plaintiff submitted a written report to the Captain/Master. Pursuant to SMS Policies and Procedures, the Captain/Master had duty to immediately document and report Plaintiff's complaint, by forwarding it to shipboard management including the Designated Person Ashore. Instead, in violation of the vessel's SMS Policies and Procedures, the Captain/Master pressured Plaintiff not to report the incident to management and challenged the veracity of the report, when made. For the next two days, Plaintiff had to work in close proximity with the department head that had terrorized, bullied, and assaulted him. As a member of vessel leadership, the Captain/Master's knowledge is imputed to the vessel owners and Plaintiff's employers ;

i.  Shipboard employees, shoreside employees, and other agents of the Defendants knew and/or should have known of prior reports or incidents involving Defendant Chief Engineer JOHN FREDERICK DAYLOR's harassment, intimidation, and potential assault of other crewmembers; and**,**

j.  Shipboard employees, shoreside employees, and other agents of Defendants recklessly disregarded Defendant Chief Engineer JOHN FREDERICK DAYLOR's violent behavior toward other crewmembers and discouraged Plaintiff MATTHEW RUSSO's official reporting of workplace harassment, assault, and battery stating that doing so would be an inconvenience in "waking people up" and that it was "a mistake."

k.  Shipboard employees, shoreside employees, and other agents of Defendants tolerated and allowed a culture of silence and suppression of complaints, shielding perpetrators of workplace harassment, assaults, and batteries. Defendants additionally failed to implement adequate policies and procedures, including adequate training of shipboard management, to proactively protect crewmembers from workplace harassment, assaults, and batteries, including adequate reporting mechanisms while at the same time isolating and ostracizing victims.

l.  Shipboard employees, shoreside employees, and other agents of Defendants tolerated and allowed a culture of silence and suppression of complaints, shielding perpetrators of

workplace harassment, assaults, and batteries, while at the same time isolating and ostracizing victims.

110.   At all times relevant and material, APL shoreside executives and company leaders knew or should have known upon a reasonable inquiry and inspection Defendant Chief Engineer JOHN FREDERICK DAYLOR reputation and pre-disposition to harass and assault crewmembers under his supervision and control, prior to Plaintiff embarking on the M/V APL GULF EXPRESS:

a.   Upon information and belief, prior to Plaintiff embarking aboard the M/V APL GULF EXPRESS, Defendants knew Defendant Chief Engineer JOHN FREDERICK DAYLOR had subjected other crewmembers under his control and supervision to relentless, intimidating and damaging harassment, physical and emotional abuse;

b.   Upon information and belief, prior to Plaintiff embarking aboard the M/V APL GULF EXPRESS, these victim crewmembers had lodged complaints against Defendant Chief Engineer JOHN FREDERICK DAYLOR, including former assistant engineer Edgar Sison. Mr. Sison complained to APL that Defendant Chief Engineer JOHN FREDERICK DAYLOR subjected him to relentless, intimidating and damaging harassment, physical and emotional abuse;

c.   Upon information and belief, prior to Plaintiff embarking aboard the M/V APL GULF EXPRESS, APL investigated Defendant Chief Engineer JOHN FREDERICK DAYLOR for allegations of harassment, hostile work environment and battery against crewmembers under his control and supervision, including the allegations made by assistant engineer Edgar Sison.

d.   Prior to Plaintiff embarking on the vessel, the JONES ACT DEFENDANTS were investigating Defendant Chief Engineer JOHN FREDERICK DAYLOR for allegations of harassment, hostile work environment and battery against crewmembers under his control and supervision, including a June 26, 2022 incident in which Defendant Chief Engineer JOHN FREDERICK DAYLOR aggressively grabbed the 2nd engineer and dragged him across the workshop in violation of the APL Code of Conduct, Document CPOM-015.USF, 3.8 Behavior Toward Others.

111.   At all times material hereto, the JONES ACT DEFENDANTS negligently failed to determine the hazards on the vessel Plaintiff MATTHEW RUSSO, failed to eliminate the hazard, failed to modify the hazards and failed to properly warn Plaintiff MATTHEW RUSSO of the hazards.

112.   All of the above caused Plaintiff MATTHEW RUSSO to suffer severe and permanent harm.

113.   As a direct and proximate result of Defendant Chief Engineer JOHN FREDERICK DAYLOR's sexual harassment and physical assault and battery, Plaintiff MATTHEW RUSSO suffered coronary artery spasms, angina, mental and emotional anguish as well as insomnia. Plaintiff MATTHEW RUSSO has suffered physical manifestations of harm, physical pain, mental suffering, mental anguish, loss of enjoyment of life, impairment inconvenience in the normal pursuits of life, feelings of economic insecurity caused by disability, aggravations of any previously existing conditions therefrom, incurred medical expenses in the care and treatment of his injuries, including psychological and psychiatric care, medications, lost wages, income lost in the past and his working ability and earning capacity has been impaired. The injuries and damages sustained by Plaintiff MATTHEW RUSSO are permanent and continuing in nature

114.   Plaintiffs demand trial by jury for the First Cause of Action, pursuant to 46 U.S.C. § 30104.

**SECOND CAUSE OF ACTION**
***CLAIM FOR UNSEAWORTHINESS***
**AGAINST DEFENDANTS APL MARITIME LTD, APL MARINE SERVICES, LTD, AMERICAN PRESIDENT LINES, LLC, CMA CGM (AMERICA) LLC AND CMA-CGM S.A. AS OWNERS AND OPERATORS OF M/V APL GULF EXPRESS, PURSUANT TO THE GENERAL MARITIME LAW AND *SEAS SHIPPING CO. V. SIERACKI*, 328 U.S. 85 (1946) (hereinafter the "SHIPOWNER DEFENDANTS")**

115.   Plaintiffs re-allege, adopt, and incorporate by reference the allegations in paragraphs 1 – 93 as though alleged originally herein.

116.   At all times material, Defendants APL MARITIME LTD, APL MARINE SERVICES, LTD, AMERICAN PRESIDENT LINES, LLC, CMA CGM (AMERICA) LLC and CMA-CGM S.A (hereinafter for purposes of the Second Cause of Action collectively referred to as

the "SHIPOWNER DEFENDANTS") owned, operated, managed, maintained and/or controlled the U.S. flag container vessel M/V APL GULF EXPRESS.

117.    The doctrine of unseaworthiness is a feature of the General Maritime Law of the United States, imposing upon the vessel owner and operator the absolute and nondelegable duty to provide its seamen with a vessel that is reasonably fit for its intended purpose. The warranty of seaworthiness extends to all parts of the vessel and to all facets of its operation, imposing upon the vessel operator a nondelegable duty to provide a competent captain and crew. This obligation is absolute and irrespective of fault.

118.    Crewmembers who launch a vicious and unprovoked attack on another crewmember, like a violent and savage assault and battery, render a vessel unseaworthy as a matter of law. (*See Miles v. Melrose*, 882 F.2d 976 (5th Cir.1989); *Clevenger v. Star Fish & Oyster Company*, 325 F.2d 397 (5th Cir.1963); *The Rolph*, 299 F.52 (9th Cir.1924); *Keen v. Overseas Tankship Corp.*, 194 F.2d 515 (2d Cir. 1952*)* (applying the warranty of seaworthiness even in instances where the vessel owners have no knowledge of a seaman's dangerous propensities).

119.     At all relevant times, the SHIPOWNER DEFENDANTS had full possession and control of the M/V APL GULF EXPRESS, including full control over the vessel's captain and crew.

120.    Pursuant to the General Maritime Law of the United States, the SHIPOWNER DEFENDANTS owed Plaintiff MATTHEW RUSSO an absolute and nondelegable duty to provide a seaworthy vessel.

121.    THE SHIPOWNER DEFENDANTS owed Plaintiff MATTHEW RUSSO an absolute and nondelegable duty to provide a seaworthy vessel because he was a seaman. In his capacity as a Third Assistant Engineer on the M/V APL GULF EXPRESS, Plaintiff MATTHEW RUSSO' duties contributed to the function of a vessel in navigation and the accomplishment of its mission. These contributions were substantial both in duration and nature.

122.    Alternatively, the SHIPOWNER DEFENDANTS owed Plaintiff MATTHEW RUSSO an absolute and nondelegable duty to provide a seaworthy vessel because he was a *Sieracki Seaman*, as defined in *Seas Shipping Co. v. Sieracki*, 328 U.S. 85 (1946).

123.    At all times material, Defendant Chief Engineer JOHN FREDERICK DAYLOR was an employee, agent, apparent agent and/or servant of the SHIPOWNER DEFENDANTS.

124.    At all times material, Defendant Chief Engineer JOHN FREDERICK DAYLOR's sexually harassed, assaulted and battered Plaintiff MATTHEW RUSSO during the course and scope of his employment and/or agency relationship with the SHIPOWNER DEFENDANTS. As a result, the SHIPOWNER DEFENDANTS are absolutely and strictly liable to Plaintiff MATTHEW RUSSO.

125.    Defendant Chief Engineer JOHN FREDERICK DAYLOR's workplace sexual harassment, assault and battery of Plaintiff MATTHEW RUSSO was of "a savage and vicious nature" such that the vessel became a "perilous place" culminating to a breach of the warranty of seaworthiness pursuant to the longstanding binding Supreme Court precedent set forth in *Boudoin v. Lykes Bros. S.S. Co.,* 348 U.S. 336, 340 (1955). Defendant Chief Engineer JOHN FREDERICK DAYLOR's actions fell outside of the "customary standards of the calling" such that the totality of his actions demonstrated his wickedness, evil, and savagery rendering the M/V APL GULF EXPRESS unseaworthy as a matter of law, and the Defendant Vessel Owner(s) strictly liable to the Plaintiff. *Id.*

126.    Plaintiff MATTHEW RUSSO's resulting injuries are due to the SHIPOWNER DEFENDANTS' breach of their absolute and nondelegable duty to provide a seaworthy vessel, including a nondelegable duty to provide adequate crew.

127.    Additionally, the SHIPOWNER DEFENDANTS, their employees, agents, apparent agents, and/or servants breached their absolute and nondelegable duty by:

a.  Allowing and failing to prevent Defendant Chief Engineer JOHN FREDERICK DAYLOR's, a crewmember on the vessel M/V APL GULF EXPRESS, to viciously engage in sexual harassment, assault and battery of Plaintiff MATTHEW RUSSO;

b.  Failing to provide Plaintiff MATTHEW RUSSO a reasonable place to work;

c.  Failing to keep and maintain the vessel in a reasonably safe condition;

d.  Allowing the creation of an intimidating, hostile and offensive work environment, in which Plaintiff MATTHEW RUSSO was sexually harassed, assaulted and battered;

39

e.   Allowing the creation of an intimidating, hostile and offensive work environment, in which Plaintiff MATTHEW RUSSO was sexually harassed and assaulted;

f.   Allowing the creation of an intimidating, hostile and offensive work environment, in which shipboard officers failed to take appropriate timely actions in response to Plaintiff MATTHEW RUSSO's sexual harassment and assault complaints;

g.   Failing to implement adequate security policies, measures, and procedures, necessary to protect crewmembers;

h.   Failing to hire and/or retain and/or train competent crewmembers, including shipboard supervisors;

i.   Failing to take additional security measures after being put on notice that Defendant Chief Engineer JOHN FREDERICK DAYLOR had a history of sexually harassing and bullying members of the crew, particularly new and younger engineers;

j.   Failing to timely discipline and/or fire and/or dismiss Defendant Chief Engineer JOHN FREDERICK DAYLOR after being on notice that on June 26, 2022 (before Plaintiff embarked on the vessel), Defendant Chief Engineer JOHN FREDERICK DAYLOR had harassed, assaulted and bullied other crewmembers;

k.   Failing to timely discipline and/or fire and/or dismiss Defendant Chief Engineer JOHN FREDERICK DAYLOR after Plaintiff MATTHEW RUSSO reported to the JONES ACT DEFENDANTS, via their agents and servants, including vessel leadership, that Defendant Chief Engineer JOHN FREDERICK DAYLOR had sexually harassed and assaulted him;

l.   Failing to implement measures to isolate Defendant Chief Engineer JOHN FREDERICK DAYLOR and preventing him from working in close proximity with Plaintiff, after Plaintiff's supervisors and other members of vessel leadership (Captain/Master, First Assistant Engineer, Second Assistant Engineer, Chief Mate, Second Mate), witnessed and learned about Defendant Chief Engineer JOHN FREDERICK DAYLOR's assault, sexual harassment, and bullying of Plaintiff;

Complaint
Jury Trial Demand

m. Failing to use reasonable care to ensure the vessel had competent and adequately trained crew, including managers and supervisors capable of handling and properly addressing crewmember sexual harassment and assault complaints;

n. Failing to take feasible and reasonable steps to eliminate the dangerous conditions which were known by the Defendants and which, in the exercise of reasonable care, should have been known by the Defendants;

o. Enabling Defendant Chief Engineer JOHN FREDERICK DAYLOR's reign of terror and victimization of Plaintiff – despite being on notice of his dangerous propensities - leading to acts in violation of APL's Code of Conduct, Document CPOM-015.USF, 3.8 Behavior Toward Others is Misconduct as described by 46 U.S.C. §7703(1)(B) and defined by 46 CFR §5.27;

p. Enabling Defendant Chief Engineer JOHN FREDERICK DAYLOR's reign of terror and victimization of Plaintiff – despite being on notice of his dangerous propensities - leading to acts in violation of 18 U.S.C. § 113 a law or regulation intended to promote marine safety as described in 46 U.S.C. § 7703(1)(A) and defined by 46 CFR §5.33;

q. Enabling Defendant Chief Engineer JOHN FREDERICK DAYLOR's reign of terror and victimization of Plaintiff – despite being on notice of his dangerous propensities - leading to acts of sexual harassment in violation of 46 U.S.C. § 7704a(a), as defined in 46 U.S.C. § 2101(46)(C).

r. Enabling Defendant Chief Engineer JOHN FREDERICK DAYLOR's reign of terror and victimization of Plaintiff – despite being on notice of his dangerous propensities - leading to acts of physical assault within maritime and territorial jurisdiction as defined in 6 Am.Jur. 2d Assault and Battery § 1 and applicable under 18 U.S.C. § 113.

s. Enabling Defendant Chief Engineer JOHN FREDERICK DAYLOR's reign of terror and victimization of Plaintiff – despite being on notice of his dangerous propensities - leading to acts in violation of the SMS and APL's Code of Conduct, including Document CPOM-015.USF, 3.8 Behavior Toward Others.

t.   Failing to take feasible and reasonable steps to eliminate the dangerous conditions which were known by the SHIPOWNER DEFENDANTS and which, in the exercise of reasonable care, should have been known by the SHIPOWNER DEFENDANTS;

128.   All of the above caused Plaintiff MATTHEW RUSSO to suffer severe and permanent harm.

129.   As a direct and proximate result of Defendant Chief Engineer JOHN FREDERICK DAYLOR's sexual harassment and physical assault and battery,  Plaintiff MATTHEW RUSSO suffered coronary artery spasms, angina, mental and emotional anguish, loss of enjoyment of life, impairment inconvenience in the normal pursuits of life, insomnia, negative professional and economic ramifications; and incurred medical expenses in the care and treatment of his injuries, including psychological and psychiatric care, medications, lost wages, income lost in the past and his working ability and earning capacity has been impaired. The injuries and damages sustained by Plaintiff MATTHEW RUSSO are permanent and continuing in nature, and Plaintiff MATTHEW RUSSO will suffer losses and impairments in the future.

130.   Plaintiff demands trial by jury for the Second Cause of Action, pursuant to 28 U.S.C. §1333 'savings to suitors' clause, and *Fitzgerald v. United States Lines Co.*, 374 U.S. 16, 18 (1963).

**THIRD CAUSE OF ACTION**
***INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS***
**AGAINST DEFENDANTS APL MARITIME LTD, APL MARINE SERVICES, LTD,
AMERICAN PRESIDENT LINES, LLC, CMA CGM (AMERICA) LLC, CMA-CGM S.A.,
AND JOHN FREDERICK DAYLOR**

131.   Plaintiffs re-allege, adopt, and incorporate by reference the allegations in paragraphs 1 – 93 as though alleged originally herein.

132.   Through Defendants' outrageous conduct as described herein and above, Defendants and their agents acted with a discriminatory intent to cause, or with a reckless disregard for the probability to cause, Plaintiff MATTHEW RUSSO humiliation, mental anguish, and substantial and enduring emotional distress. To the extent that said outrageous conduct was perpetrated by certain agents of Defendants, Defendants authorized and ratified the conduct with the knowledge that

Complaint
Jury Trial Demand

1   Plaintiff MATTHEW RUSSO's emotional and physical distress would thereby increase, and with a

2   wanton and reckless disregard for the deleterious consequences to Plaintiff MATTHEW RUSSO.

3        133.   In the alternative, Defendants' outrageous conduct as described herein and above,

4   Defendants and their agents is a Maritime tort under 28 U.S.C. §1333. At all times relevant, the

5   incidents occurred on navigable waters, thus satisfying the "maritime locus" requirement. *The*

6   *Plymouth*, 70 U.S. 20 (1865). Per the "nexus" criterion, Plaintiff's emotion and physical distress

7   was one, when viewed at an "intermediate level of generality" that could have a potentially

8   disruptive effect on maritime commerce. *Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S.

9   527 (1995).   Further, Defendants' intentional infliction of emotional distress on the Plaintiff

10   occurred at a time whereupon their activity on the vessel was "substantially related to traditional

11   maritime activity." *Id.* At 534.

12        134.   As a direct and proximate result of Defendants' actions against Plaintiff MATTHEW

13   RUSSO, as alleged above, Plaintiff MATTHEW RUSSO has suffered special damages including

14   but not limited to loss of wages, including front and back pay, and benefits, and consequential

15   damages in an amount to be proven at time of trial, in excess of the minimum jurisdictional

16   requirements of this Court.

17        135.   As a further direct and proximate result of Defendants' actions against Plaintiff

18   MATTHEW RUSSO, as alleged above, Plaintiff MATTHEW RUSSO has suffered and continues

19   to suffer general damages including but not limited to significant and enduring emotional distress

20   including humiliation, mental anguish and physical distress, injury to mind and body, in a sum to

21   be proven at time of trial, in excess of the minimum jurisdictional requirements of this Court.

22        136.   As a further direct and proximate result of Defendants' actions against Plaintiff

23   MATTHEW RUSSO, as alleged above, Plaintiff MATTHEW RUSSO has suffered and continues

24   to suffer general damages including but not limited to significant and enduring emotional distress

25   including humiliation, mental anguish and physical distress, injury to mind and body, in a sum to

26   be proven at time of trial, in excess of the minimum jurisdictional requirements of this Court.

27

28

137.    As a maritime tort under 28 U.S.C. §1333, pursuant to the 'savings to suitors' clause and *Fitzgerald v. United States Lines Co.*, 374 U.S. 16, 18 (1963), plaintiff further demands trial by jury for the Third Cause of Action.

## FOURTH CAUSE OF ACTION
### *NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS*
**AGAINST DEFENDANTS APL MARITIME LTD, APL MARINE SERVICES, LTD, AMERICAN PRESIDENT LINES, LLC, CMA CGM (AMERICA) LLC, AND CMA-CGM S.A.,**

138.    Plaintiffs re-allege, adopt, and incorporate by reference the allegations in paragraphs 1 – 93 as though alleged originally herein.

139.    Defendants and their agents negligently engaged in certain acts as alleged herein and above, which proximately resulted in injury and emotional distress to Plaintiff MATTHEW RUSSO.

140.    At all times material herein, Defendants knew, or in the exercise of ordinary care should have known, that unless Defendants and their agents ceased to engage in the aforementioned acts, or intervened to protect Plaintiff, and to prohibit, control, regulate and/or penalize the conduct of Defendants' agents, as alleged herein, that the conduct would continue, thereby subjecting Plaintiff to personal injury and emotional distress.

141.    In the alternative, Defendants' outrageous conduct as described herein and above, Defendants and their agents is a Maritime tort under 28 U.S.C. §1333. At all times relevant, the incidents occurred on navigable waters, thus satisfying the "maritime locus" requirement. *The Plymouth*, 70 U.S. 20 (1865). Per the "nexus" criterion, Plaintiff's emotion and physical distress was one, when viewed at an "intermediate level of generality" that could have a potentially disruptive effect on maritime commerce. *Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995).   Further, Defendants' intentional infliction of emotional distress on the Plaintiff occurred at a time whereupon their activity on the vessel was "substantially related to traditional maritime activity." *Id.* At 534.

142.    As a direct, proximate and foreseeable result of Defendants' actions against Plaintiff, as alleged above, Plaintiff has suffered special damages including but not limited to loss of wages, including front and back pay, and benefits, and consequential damages in an amount to be proven at time of trial, in excess of the minimum jurisdictional requirements of this Court.

143. As a further direct and proximate result of Defendants' actions against Plaintiff, as alleged above, Plaintiff has suffered and continues to suffer general damages including but not limited to significant and enduring emotional distress including humiliation, mental anguish and physical distress, injury to mind and body, in a sum to be proven at time of trial, in excess of the minimum jurisdictional requirements of this Court.

144. As a maritime tort under 28 U.S.C. §1333, pursuant to the 'savings to suitors' clause and *Fitzgerald v. United States Lines Co.*, 374 U.S. 16, 18 (1963), plaintiff further demands trial by jury for the Fourth Cause of Action.

### FIFTH CAUSE OF ACTION
### *SEXUAL HARRASMENT*
### AGAINST FREDERICK JOHN DAYLOR

145. Plaintiffs re-allege, adopt, and incorporate by reference the allegations in paragraphs 1 – 93 as though alleged originally herein.

146. At all times material, Defendant FREDERICK JOHN DAYLOR engaged in sexually harassing conduct which was so severe and so pervasive as to create a hostile and abusive work environment, altering the conditions of the Plaintiff's employment.

147. At all times material, Defendant FREDERICK JOHN DAYLOR's abuse was frequent, severe, physically threatening and humiliating, such that it interfered with Plaintiff's work performance, including:

a. Approximately a week after the incident of November 14, 2022, during maneuvering at around 2 – 3 AM, Plaintiff was assigned to work alone alongside Defendant Chief Engineer JOHN FREDERICK DAYLOR, in the Engine Control Room. Plaintiff was sitting in front of the monitors, while Defendant Chief Engineer JOHN FREDERICK DAYLOR was sitting on the other side of the Engine Control Room in front of his computer. Plaintiff was doing a Sudoku puzzle in his notebook. Defendant Chief Engineer JOHN FREDERICK DAYLOR asked him from across the room what Plaintiff was doing and Plaintiff responded, "a Sudoku puzzle." Defendant Chief Engineer JOHN FREDERICK DAYLOR, during the course and scope of his employment and agency

relationship with Defendants, stood up from his seat walked over to Plaintiff and leaned his crotch and stomach on Plaintiff's shoulder, neck and back area. Defendant Chief Engineer JOHN FREDERICK DAYLOR put so much of his body weight onto Plaintiff that it forced Plaintiff to lean more into him to prevent himself from falling over. With his crotch and belly draped over Plaintiff, Defendant Chief Engineer JOHN FREDERICK DAYLOR, during the course and scope of his employment and agency relationship with Defendants, said in a hostile manner "Do you know everything about this power plant?" Plaintiff replied, "No." Defendant Chief Engineer JOHN FREDERICK DAYLOR said with the same tone: "Do you know how every piece of machinery in the engine room works?" Plaintiff replied, "No." Defendant Chief Engineer JOHN FREDERICK DAYLOR exploded and yelled, "Then put the [expletive] game away!" Plaintiff did as instructed.   Defendant Chief Engineer JOHN FREDERICK DAYLOR then walked away and sat back down. Plaintiff was in shock and scared;

b. Subsequently, on a later date, Plaintiff was assigned to work alongside Defendant Chief Engineer JOHN FREDERICK DAYLOR in the Engine Control Room at approximately 4 – 5 AM. Defendant Chief Engineer JOHN FREDERICK DAYLOR complained about pain in the palm of his hand. Defendant Chief Engineer JOHN FREDERICK DAYLOR, during the course and scope of his employment and agency relationship with Defendants, walked over to the Plaintiff an placed his palm in front of his face saying: "Go ahead, rub it." No, said Plaintiff. Defendant Chief Engineer JOHN FREDERICK DAYLOR kept the palm of his hand on Plaintiff's face, demanding Plaintiff rub the palm of his hand and saying "Just feel it!." Plaintiff responded, "Get your hand out of my face right now." Plaintiff reported the incident to other members of the Engine Department at coffee the next day;

c. Subsequently, on a later date, Plaintiff was assigned to work alongside Defendant Chief Engineer JOHN FREDERICK DAYLOR in the Engine Control Room. Defendant Chief Engineer JOHN FREDERICK DAYLOR told Plaintiff a story about his grandson getting his penis caught in the zipper of his pants when he was a younger child. Defendant Chief

Engineer JOHN FREDERICK DAYLOR was graphic with the details, telling Plaintiff what he had to do to help the boy remove his penis from his zipper.  Defendant Chief Engineer JOHN FREDERICK DAYLOR, during the course and scope of his employment and agency relationship with Defendants, proceeded to ask Plaintiff if his penis or testicles had ever been stuck in his zipper;

d.  Subsequently, on a later date, Plaintiff was assigned to work alongside Defendant Chief Engineer JOHN FREDERICK DAYLOR in the Engine Control Room. Defendant Chief Engineer JOHN FREDERICK DAYLOR, during the course and scope of his employment and agency relationship with Defendants, shared with Plaintiff intimate details about his sex life, describing intimate details about his wife's grooming and genitals;

e.  Subsequently, on a later date, most of the Engine Department was gathered together in the Engine Control Room during a coffee break. Plaintiff was wearing company coveralls, and the soft shoulder board fabric was unbuttoned on his right shoulder. Defendant Chief Engineer JOHN FREDERICK DAYLOR, during the course and scope of his employment and agency relationship with Defendants, told Plaintiff his shoulder board was unbuttoned, grabbed Plaintiff's shoulder and started trying to button it for Plaintiff, without Plaintiff's consent;

f.  On or about December 27, 2022, Plaintiff was seated next to the other Third Assistant Engineer, Second Assistant Engineer Thomas Jackson, Second Mate William Murphy, and  Defendant Chief Engineer JOHN FREDERICK DAYLOR, for dinner at the Officer's Mess Hall. The group discussed the new Coast Guard regulation requiring all US Flagged vessels to be equipped with cameras in common areas and passageways for the safety of crew and cadets due to the many rapes and sexual assaults occurring on ships. Defendant Chief Engineer JOHN FREDERICK DAYLOR, during the course and scope of his employment and agency relationship with Defendants, said to everyone, "That's too bad for us, the longer [Plaintiff's] hair gets every day, the more rape-able he looks;"

g.  On or about January 2, 2023, Plaintiff was working out in the gym. The Chief Mate Koutaiba Saad was in the gym on the elliptical at the same time. Plaintiff was doing ab-wheel roll outs when Defendant Chief Engineer JOHN FREDERICK DAYLOR opened the door and took a step in. The Chief Mate Koutaiba Saad said "come in and work out Chief." Defendant Chief Engineer JOHN FREDERICK DAYLOR, during the course and scope of his employment and agency relationship with Defendants, replied: "No chance in Hell! I'm just here looking at [Plaintiff's] ass;"

h.  On or about January 3, 2023, an alarm went off in the engine room. Plaintiff went to the control room to silence the alarm. Defendant Chief Engineer JOHN FREDERICK DAYLOR was standing at the control panel looking at the alarm next to Plaintiff. Defendant Chief Engineer JOHN FREDERICK DAYLOR, during the course and scope of his employment and agency relationship with Defendants, grabbed Plaintiff, pulling him into his body, and screamed at Plaintiff's face, "You better not be [expletive] welding while we're bunkering!" Plaintiff lunged back to free himself from Defendant's hands yelling back, "Get your hands off me right now!" Plaintiff was terrified, running out of the control room to the Machine Shop to calm himself from shock.

148.   Defendant Chief Engineer JOHN FREDERICK DAYLOR's conduct, sexual harassment, assault and battery of Plaintiff between November 14, 2022, through January 5, 2023.

149.   As a result of Defendant JOHN FREDERICK DAYLOR's sexual harassment, Plaintiff suffered physical manifestations of harm, physical pain, mental suffering, mental anguish, loss of enjoyment of life, impairment inconvenience in the normal pursuits of life, feelings of economic insecurity caused by disability, aggravations of any previously existing conditions therefrom, incurred medical expenses in the care and treatment of his injuries, including psychological and psychiatric care, medications, lost wages, income lost in the past and his working ability and earning capacity has been impaired. The injuries and damages sustained by Plaintiff are permanent and continuing in nature, and Plaintiff will suffer losses and impairments in the future.

150.   Plaintiff demands trial by jury for the Fifth Cause of Action, pursuant to 28 U.S.C. §1333 'savings to suitors' clause, and *Fitzgerald v. United States Lines Co.*, 374 U.S. 16, 18 (1963).

48

**SIXTH CAUSE OF ACTION**
*INENTIONAL TORT OF BATTERY*
**AGAINST FREDERICK JOHN DAYLOR**

151.    Plaintiffs re-allege, adopt, and incorporate by reference the allegations in paragraphs 1 – 93 as though alleged originally herein.

152.    At all times relevant and material, Defendant Chief Engineer JOHN FREDERICK DAYLOR acted with the intent to cause harmful and offensive contact with Plaintiff, without his consent, including:

a.  On November 14, 2022, there was an all hands, time critical job in the Engine Room. The LT cooler inlet valve had broken. During parts of the job, salt water was flowing to the Engine Room. As Plaintiff was assisting the First Assistant Engineer in removing the broken valve, Plaintiff was using an adjustable wrench. Defendant Chief Engineer JOHN FREDERICK DAYLOR was standing behind Plaintiff holding a heavy fixed wrench that was the correct size for the task (19mm metal box wrench). Instead of handing the wrench to Plaintiff, Defendant Chief Engineer JOHN FREDERICK DAYLOR, during the course and scope of his employment and agency relationship with Defendants, struck Plaintiff forcefully in the side of Plaintiff's head three times in quick succession. At all relevant and material times, the vessel's First Assistant Engineer witnessed Defendant Chief Engineer JOHN FREDERICK DAYLOR striking Plaintiff in the head with the wrench;

b.  Approximately a week after the incident of November 14, 2022, during maneuvering at around 2 – 3 AM, Plaintiff was assigned to work alone alongside Defendant Chief Engineer JOHN FREDERICK DAYLOR, in the Engine Control Room. Plaintiff was sitting in front of the monitors, while Defendant Chief Engineer JOHN FREDERICK DAYLOR was sitting on the other side of the Engine Control Room in front of his computer. Plaintiff was doing a Sudoku puzzle in his notebook. Defendant Chief Engineer JOHN FREDERICK DAYLOR asked him from across the room what Plaintiff was doing and Plaintiff responded, "a Sudoku puzzle."  Defendant Chief Engineer JOHN

49

FREDERICK DAYLOR, during the course and scope of his employment and agency relationship with Defendants, stood up from his seat walked over to Plaintiff and leaned his crotch and stomach on Plaintiff's shoulder, neck and back area. Defendant Chief Engineer JOHN FREDERICK DAYLOR put so much of his body weight onto Plaintiff that it forced Plaintiff to lean more into him to prevent himself from falling over. With his crotch and belly draped over Plaintiff, Defendant Chief Engineer JOHN FREDERICK DAYLOR, during the course and scope of his employment and agency relationship with Defendants, said in a hostile manner "Do you know everything about this power plant?" Plaintiff replied, "No." Defendant Chief Engineer JOHN FREDERICK DAYLOR said with the same tone: "Do you know how every piece of machinery in the engine room works?" Plaintiff replied, "No." Defendant Chief Engineer JOHN FREDERICK DAYLOR exploded and yelled, "Then put the [expletive] game away!" Plaintiff did as instructed.  Defendant Chief Engineer JOHN FREDERICK DAYLOR then walked away and sat back down. Plaintiff was in shock and scared;

c. Subsequently, on a later date, Plaintiff was assigned to work alongside Defendant Chief Engineer JOHN FREDERICK DAYLOR in the Engine Control Room at approximately 4 – 5 AM. Defendant Chief Engineer JOHN FREDERICK DAYLOR complained about pain in the palm of his hand. Defendant Chief Engineer JOHN FREDERICK DAYLOR, during the course and scope of his employment and agency relationship with Defendants, walked over to the Plaintiff an placed his palm in front of his face saying: "Go ahead, rub it." No, said Plaintiff. Defendant Chief Engineer JOHN FREDERICK DAYLOR kept the palm of his hand on Plaintiff's face, demanding Plaintiff rub the palm of his hand and saying "Just feel it!." Plaintiff responded, "Get your hand out of my face right now." Plaintiff reported the incident to other members of the Engine Department at coffee the next day;

d. Subsequently, on a later date, most of the Engine Department was gathered together in the Engine Control Room during a coffee break. Plaintiff was wearing company coveralls, and the soft shoulder board fabric was unbuttoned on his right shoulder.

Defendant Chief Engineer JOHN FREDERICK DAYLOR, during the course and scope of his employment and agency relationship with Defendants, told Plaintiff his shoulder board was unbuttoned, grabbed Plaintiff's shoulder and started trying to button it for Plaintiff, without Plaintiff's consent.

e. On or about January 3, 2023, an alarm went off in the engine room. Plaintiff went to the control room to silence the alarm. Defendant Chief Engineer JOHN FREDERICK DAYLOR was standing at the control panel looking at the alarm next to Plaintiff. Defendant Chief Engineer JOHN FREDERICK DAYLOR, during the course and scope of his employment and agency relationship with Defendants, grabbed Plaintiff, pulling him into his body, and screamed at Plaintiff's face, "You better not be [expletive] welding while we're bunkering!" Plaintiff lunged back to free himself from Defendant's hands yelling back, "Get your hands off me right now!" Plaintiff was terrified, running out of the control room to the Machine Shop to calm himself from shock.

153.   As a result of the intentional tort of battery by Defendant Chief Engineer JOHN FREDERICK DAYLOR, Plaintiff suffered physical manifestations of harm, physical pain, mental suffering, mental anguish, loss of enjoyment of life, impairment inconvenience in the normal pursuits of life, feelings of economic insecurity caused by disability, aggravations of any previously existing conditions therefrom, incurred medical expenses in the care and treatment of his injuries, including psychological and psychiatric care, medications, lost wages, income lost in the past and his working ability and earning capacity has been impaired. The injuries and damages sustained by Plaintiff are permanent and continuing in nature, and Plaintiff will suffer losses and impairments in the future.

154.   Plaintiff demands trial by jury for the Fifth Cause of Action, pursuant to 28 U.S.C. §1333 'savings to suitors' clause, and Fitzgerald v. United States Lines Co., 374 U.S. 16, 18 (1963).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff MATTHEW RUSSO prays for judgment against Defendants, and each of them, as follows:

1.     To Plaintiff MATTHEW RUSSO, pursuant to the Jones Act and the General

51

Maritime Law of the United States, damages for physical manifestations of harm, physical pain, mental suffering, mental anguish, loss of enjoyment of life, impairment, inconvenience in the normal pursuits of life, feelings of economic insecurity caused by disability, aggravations of any previously existing conditions therefrom, medical expenses in the care and treatment of his injuries, including psychological and psychiatric care, medications, lost wages, income lost in the past and for impairments for future earning capacity.

2.    For such other and further relief as the Court may deem proper.

Date: September 6, 2024,

NELSON & FRAENKEL, LLP

By /s/ Carlos F. Llinas Negret
Carlos F. Llinás Negret
*Attorneys for Plaintiff*

### **JURY TRIAL DEMAND/REQUEST**

Plaintiff hereby requests and demands a trial by jury on all claims so triable.

Date: September 6, 2024,

NELSON & FRAENKEL, LLP

By /s/ Carlos F. Llinas Negret
Carlos F. Llinás Negret
*Attorneys for Plaintiff*

Complaint
Jury Trial Demand